Louis PORTER, Appellee,

John B. Jarboe, Trustee–Appellee,

v.

YUKON NATIONAL BANK, a National Banking Association, Appellant.

No. 87–1604.

United States Court of Appeals, Tenth Circuit.

Jan. 25, 1989.

John B. Jarboe (Sidney K. Swinson with him, on the briefs) of Jarboe, Swinson & Stoermer, Tulsa, Okl., for appellee John B. Jarboe, trustee.

Robert L. Roark of McKinney, Stringer & Webster, P.C., Oklahoma City, Okl., for appellant.

Before MOORE, ANDERSON and EBEL, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

In this bankruptcy case, a creditor, Yukon National Bank, appeals from the decision of the district court affirming a judgment of the bankruptcy court voiding a pre-bankruptcy transfer between the debtor and the Bank. The bankruptcy court found that the transfer constituted a voidable preference and a fraudulent transfer within the meaning of the Bankruptcy Code. We agree the transfer resulted in a

preference; therefore, we affirm without considering whether the transfer was also fraudulent.

The action from which this appeal flows was filed by the trustee of the debtor's estate. The purpose of the action was to recover, for the benefit of the estate, certain property transferred by the debtor to the Bank to collateralize a preexisting debt.

A pretrial stipulation filed by the parties discloses that on the day of the transfer in dispute, May 2, 1983, the debtor was in default on notes owed to the Bank in the amount of $1,025,000. These notes were secured by 700,000 shares of the common stock of Dalco Petroleum Corporation, an entity in which the debtor was principal stockholder. On the date of the transfer, the original notes were cancelled, and the debtor executed a new note in the amount of $1,042,490.67.[1] To collateralize the new note, the debtor transferred to the Bank his interest in the proceeds of the sale of the Dalco office building; one third of debtor's interest in certificates of deposit and cash held as a supersedeas bond by the United States District Court for the District of Kansas; all of debtor's interest in a promissory note executed by Delaware Energy Shares, Inc., (DES) in the face amount of $4,050,000; and the 700,000 shares of Dalco stock which secured the original notes.

Two weeks after the execution of the new note, debtor received $283,033.23 from the proceeds of the sale of the Dalco office building. That sum was paid to the Bank and credited to the new note. Then, on June 10, 1983, the Bank received $18,000 from the DES note and applied that sum to the debtor's obligation. An involuntary petition in bankruptcy was filed against the debtor on May 25, 1983.

## I.

Bankruptcy Code § 547(b), 11 U.S.C. § 547(b), provides that a trustee may avoid the transfer of a debtor's interest in property: (1) to a creditor; (2) for an antecedent

debt; (3) made while the debtor was insolvent; (4) within ninety days of the filing of a petition for relief in bankruptcy; (5) that enables the creditor to receive more than the creditor would receive if the transfer had not been made and the debtor's estate were liquidated under Chapter 7 of the Bankruptcy Code. Because of stipulations made by the Bank, only points (3) and (5) were contested. The bankruptcy court decided both issues in favor of the trustee, and these findings were affirmed by the district court.

On appeal in this court, the Bank first takes issue with the bankruptcy court's determination that the debtor was insolvent on the date of the transfer. The focus of this dispute centers upon the quality of the evidence presented by both sides. The Bank argues the trustee presented insufficient evidence to overcome that of the Bank. The basis for this contention is the Bank's assertion that "the issue of solvency is determined not so much by the credibility and demeanor of the witnesses, but rather by documentary evidence reflecting [debtor's] assets and liabilities as of the date of transfer to Yukon National Bank." On the basis of this assertion, the Bank contends the trustee failed his burden of proof because he did not present "a thoughtful, well documented analysis of the Debtor's assets and liabilities on the specific date of the transfer."

Initially, we perceive the Bank's argument to be merely that its evidence was more credible than that of the trustee. Additionally, however, the Bank seemingly contends that solvency and the valuations by which solvency is determined are matters which are proved in only one way. That argument does not accurately represent the law, however.

The application of an assets-and-liabilities test requires of necessity an appraisal of the property involved. Unfortunately, however, value is not a natural or fixed quality but will vary according to the purposes and policies which dictate

1. The difference between the amount of the original debt and the new note is the amount of interest accrued on the old obligation. No cash was advanced to the debtor, and the interest was added to the principal of the old debt to create the principal of the new note.

the determinative judgments and the processes by which it is ascertained. The statute [11 U.S.C. § 101(26) defining "insolvent"] describes the controlling standard of valuation with one brief phrase: "at *fair* valuation." ...

2 L. King, *Collier on Bankruptcy* ¶ 101.31[4] (15th ed. 1988) (emphasis in original). Thus, the matrix within which questions of solvency and valuation exist in bankruptcy demands that there be no rigid approach taken to the subject. Because the value of property varies with time and circumstances, the finder of fact must be free to arrive at the "fair valuation" defined in § 101(26) by the most appropriate means. We therefore reject at the outset the Bank's suggestion that the trustee failed to carry his burden simply because he did not introduce expert testimony of the kind relied upon by the Bank.

## II.

■ The parties agreed during oral argument in this court that the issue of the debtor's solvency can turn upon the valuation of one debt owed by the debtor at the time the new note was executed. The obligation is one which was owed jointly by the debtor and Dalco to the United States Department of Energy (DOE) in an amount in excess of $15 million. Before debtor's transfer of the additional collateral to the Bank, debtor had negotiated a conditional settlement with the DOE which reduced his obligation on the debt to $1 million. However, on the date of bankruptcy, the conditions were not satisfied, and DOE voided the settlement.

The Bank took the position that, on the date of the subject transfer, the settlement was still pending; and as a consequence, the debtor was obligated to DOE in the amount of $1 million only. The position was supported by expert testimony that Financial Accounting Standard 5 of the General Accepted Accounting Principles, relating to contingent liabilities and accepted accounting procedures, permitted this valuation of the DOE debt. The expert relied upon Standard 5 to conclude that on the date of the transfer, it was not "probable" that the debtor would be liable for the $14 million balance of the DOE debt. On the basis of this conclusion, the expert declared the debtor's balance sheet indicated he was solvent on the date of the transfer.

Relying upon the statutory definition of insolvency,[2] the trustee posited that the value of the DOE obligation was more accurately expressed in the DOE proof of claim filed after bankruptcy. Because that claim was not disputed, the trustee argued the DOE claim is *prima facie* evidence of the validity and amount of its debt. Fed.R. Bankr. 3001(f).

The issue put to the bankruptcy court, then, was whether the contingent settlement of the DOE obligation resulted in the reduction of the value of the debt. Yet, although trustee's counsel told us in oral argument that the bankruptcy judge found the debt was fixed and only the settlement was contingent, the record indicates *no* findings were made on the DOE obligation.[3] When the Bank's counsel pressed the court on the issue of the DOE debt, the following exchange took place:

MR. ROARK [Bank's Counsel]: If I may ask one question again with [sic] the DOE claim, because it has been of such significance. The Court did not mention that expressly and I was wondering if you took that into account.

THE COURT: The Court did not mention that expressly. I don't think it is even required that I make a finding as to the amount. I did consider the claim at the time—my calculations show that it makes no difference.

This exchange shows that the bankruptcy court did not base its finding of insolvency on the DOE claim. Instead, the court de-

---

2. "With reference to an entity other than a partnership, financial conditions such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation...." 11 U.S.C. § 101(26)(A).

3. Indeed, the DOE debt was ignored entirely by the bankruptcy judge because he decided the issue of solvency solely upon the basis of his valuation of the debtor's assets on the date of transfer.

termined the debtor's assets were overvalued by the Bank's expert. The court stated:

> By virtue of the fact that the Court cannot, under all the evidence, give credence to the Delaware Energy Shares asset of five million seven hundred seventy-five thousand dollars plus, and the sum of money involved in the Dalco stock as well as the Mac Energy, the Court will specifically find that as of the date of transfers this debtor was in fact insolvent; and I need to mention by virtue of the Delaware Energy Shares matter having restrictions thereon, the Court will not dwell upon the true value of the Dalco Petroleum shares and the Mac Energy shares on May 2, 1983.

If the bankruptcy court's valuation of the debtor's assets is correct, the debtor would have been insolvent at the time of the transfer even if the DOE claim was valued at only $1 million.[4] In order to overturn the bankruptcy court's decision, we must find the court's valuation of the assets was clearly erroneous. Unfortunately, the Bank fails to deal with this issue.

The only attack made by the Bank is upon the quality of the trustee's evidence in comparison to that of its own and upon the valuation of the DOE claim. By failing to take issue with the bankruptcy court's findings on the valuation of debtor's assets and point out why they are clearly erroneous, the Bank has missed the point of the appeal.

We have independently undertaken a review of the bankruptcy court's findings, however, and we conclude they are supported by the evidence. The critical findings are in the following:

> In looking at the exhibits and the attachments thereto, the Court desires to comment on the fact that Delaware Energy Shares is shown in the Schedule Of Assets as an asset of five million seven hundred seventy-five thousand dollars

and on the face itself of said exhibit, Plaintiff's Exhibit 6J–2, [not contained in the record on appeal] the exhibit itself encumbers and restricts said promissory note, informing the parties involved that said note is issued in connection with a merger, and said note is subject to the terms and conditions thereof, and the terms and conditions thereof are incorporated into said note. Any reasonable person, in this Court's opinion, would have to go to the terms and conditions of the particular agreement concerning the merger to determine whether or not said note has any infirmities, is in fact due, owing and unpaid, and accordingly, the Court finds that said promissory note is in fact a contingent asset, contingent upon the terms and conditions of the note. I cannot, under those conditions, determine that any person could, on May 2, 1983, give full and complete credit in the sum of five million seven hundred seventy-five thousand dollars to said note.

The exhibit describing the note referred to by the court is not before us; however, we do have Defendant's Exhibit 2, the debtor's balance sheet prepared by the Bank's expert. It reflects, as an asset, a note described as "Delaware Energy Shares" valued at $5,775,436. Accounting Note 10 appended to this entry indicates debtor had stated this asset consists of DES notes in the aggregate of $5,760,000 which were outstanding on the date of transfer. Additionally, Accounting Note 10 states that the debtor expressed the belief that on the date of transfer these notes were fully collectable.

The bankruptcy court rejected the hearsay evidence of collectability and independently determined the Delaware Energy Shares notes had no value on the date of transfer. This conclusion is supported by the testimony of the Bank's expert who, on cross-examination, testified that the collectability of those notes was dubious because

---

4. The Bank's own balance sheet analysis of the debtor's solvency, which valued the DOE claim at only $1 million, showed the debtor had a net surplus of assets of $2,389,480. By refusing to value the DES notes at over $5 million and the Dalco stock at over $3 million, as the Bank did, the court, in effect, found the debtor to be insolvent by a wide margin.

of circumstances in existence at the time of transfer.

Upon the basis of the previously quoted findings, the court concluded that the debtor was insolvent. We cannot state that the findings leading to this conclusion were clearly erroneous. Thus, we disagree with the Bank that the trustee failed to prove the debtor was insolvent on the date of transfer.

### III.

■ This leaves for consideration only the issue of whether the transfer resulted in recovery by the Bank of more than it would have received upon debtor's liquidation in Chapter 7. The bankruptcy court made no findings on this issue, but it expressed this conclusion:

> Having found that the debtor was insolvent on May 2, 1983, and from the testimony of Mr. Jarboe, albeit general in nature, it is obvious from all of the evidence before the Court that the creditor has in fact received more than he [sic] would have received in a case under Chapter 7; and thus the plaintiff may prevail on its [sic] 547 action.

The absence of specific findings makes difficult the review of this conclusion.

The evidence is undisputed, however, that prior to the execution of the new obligation and the transfers of the additional assets to secure it, the Bank was not fully secured. The only security for its debt was the Dalco stock, which the bankruptcy court valued at $525,000 on the date of transfer. Thus, prior to that time, the Bank held a secured claim in the amount of $525,000 and an unsecured claim in the amount of $500,000.[5] After the transfer, the unsecured portion of the debt was reduced by the value of the additional collateral provided by the proceeds of the sale of the Dalco building and the certificates of deposit held in the district of Kansas.[6] According to the evidence, the value of the former was $283,033, and that of the latter was $300,000. Thus, the effect of the transfer was to change the status of the Bank from that of a partially unsecured creditor to that of a fully secured creditor. Since the evidence indicates no unsecured creditor would receive full payment on liquidation, this change in status is sufficient to establish the last element of a preferential transfer.

It is axiomatic when a creditor is the beneficiary of a transfer that would result in full payment of its obligation, and no other creditor in its class would be similarly treated on liquidation, that creditor has been preferred. *Barash v. Public Fin. Corp.*, 658 F.2d 504, 508–09 (7th Cir.1981). We therefore conclude the decision of the bankruptcy court was not clearly erroneous. Having reached this conclusion, we believe it is unnecessary to consider the remaining issue, because even if the Bank were correct in its contention, any error would be harmless.

AFFIRMED.

---

5. A creditor can have both a secured and unsecured claim arising out of the same transaction. 11 U.S.C. § 506(a).

6. Because the bankruptcy court concluded the Dalco Energy Shares notes were valueless for the purpose of insolvency, we must also assume the one DES note given as security had no value to secure the new loan.