In re MAMA D'ANGELO, INC., Debtor.

Duane H. GILLMAN, Trustee, Appellant,

v.

SCIENTIFIC RESEARCH PRODUCTS
INC. OF DELAWARE, Appellee.

No. 94–4137.

United States Court of Appeals,
Tenth Circuit.

May 25, 1995.

Duane H. Gillman (R. Mont McDowell and Leslie J. Randolph with him on the brief), of McDowell and Gillman, P.C., Salt Lake City, for plaintiff-appellant.

George W. Pratt of Jones, Waldo, Holbrook and McDonough, Salt Lake City, for defendant-appellee.

Before SEYMOUR, Chief Judge, ALDISERT * and BALDOCK, Circuit Judges.

ALDISERT, Circuit Judge.

This appeal originates from an adversary proceeding filed by the trustee of the bankruptcy estate of Mama D'Angelo, Inc., to avoid, as preferential transfers, two payments the debtor made to Scientific Research Products Inc. of Delaware. The trustee's appeal from a district court judgment reversing a bankruptcy court order requires us to decide whether the bankruptcy court's finding of insolvency was clearly erroneous.

The issue presented is one of valuation: Whether the bankruptcy court clearly erred when it found that the debtor was not a going concern on the dates of the transfers and accordingly calculated the debtor's assets at liquidation values. We agree with the bankruptcy court and reverse the judgment of the district court.

Jurisdiction was proper in the district court pursuant to 28 U.S.C. § 158(a) (appeal from a bankruptcy court). This court has jurisdiction under 28 U.S.C. § 158(d). Appeal was timely filed under Rule 4(a), Federal Rules of Appellate Procedure.

## I.

Mama D'Angelo, Inc., was in the business of making pizza. But lest the name suggest inappropriate connotations, this was not a mom and pop operation. To the contrary, this probably was the most elaborate, intricately mechanized, state-of-the-art pizza-making factory in the world. It boasted a spiral crust plant that was four stories tall with contraptions, assembly lines and conveyer belts designed to turn out topped, vacuum-packed, "fresh-but-never-frozen" pizzas at the rate of one per second. But Mama's predecessors of centuries past with their efficient, tiny wood-fired brick ovens back in *la bell'italia* are not turning over in their graves; this Rube Goldberg contraption that cost millions to engineer and install was a dismal failure.

Incorporated in late 1987, Mama D'Angelo began operations in early 1988 with a start-up facility in West Jordan, Utah. On July 4, 1989, after successful test marketing, Mama D'Angelo closed the West Jordan facility and moved its operations to a much larger facility at the Salt Lake International Center.

Manufacturing pizzas at the new facility proved impracticable. Defective components and design thwarted the baking process. The "spiral proofer," essential to the operations, was defective and simply would not work. Similarly, the conveyer belts were configured to include too many right-angled turns and transfer points; it should suffice to say that the pizzas did not resemble the traditional circular shapes that originated in Napoli. Defects in the baking process spread to the topping section, where the misshapened pizza crusts jammed the conveyers. And finally, even if a saleable pizza managed to survive the baking and topping sections, the packaging section also was flawed.

The new facility closed its doors October 10, 1989, approximately three months after commencing operations. This bankruptcy resulted. Mama D'Angelo filed a Chapter 11 petition on November 6, 1989. On May 10, 1990, the case was converted to a Chapter 7 case.

Mama D'Angelo was a financial disaster. Before the move to Salt Lake City, in the first six months of 1989, the company had a

---

* The Honorable Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

net operating loss of $2,087,156. The financial picture worsened still after the move. For the three months of operations at the new facility, the company suffered an additional net operating loss of $3,184,394. Total sales from the new facility for the months July through October 1989 were $866,431 (an average of $217,000 per month), when it needed between $4.8 million and $7.2 million to break even.

These massive operating losses notwithstanding, Mama D'Angelo paid all of its monthly operating expenses and major debt obligations as they came due. This was made possible by C.R. Allen, III, who held 96% of Mama D'Angelo's shares. Allen advanced all necessary cash in the form of loans and capital contributions to fund the company's operations—a total of approximately $17 million from Mama D'Angelo's inception through the time the decision was made to close down the operation in October 1989. Allen's total 1989 cash infusion was $4,287,000.

Allen's personal coffer was not the only source of operating cash. In February 1989, Mama D'Angelo needed additional cash. Allen was also the 94% shareholder of another company, Scientific Research Products Inc. of Delaware, a corporation that manufactures ethnic hair products. Fred Phelan, chair of the boards of both Scientific and Mama D'Angelo, and personal adviser to Allen, arranged for the sister company to lend $250,000 to Mama D'Angelo. Mama D'Angelo later repaid this loan in two installments: $150,000 on July 25, 1989, and $100,000 on September 15, 1989. These two payments totalling $250,000 constitute the basis of this litigation.

## II.

The trustee sought to avoid the two loan repayments as "preferential transfers" under 11 U.S.C. § 547(b). To avoid a transfer the trustee must establish that a transfer was made to the creditor on account of an antecedent debt while the debtor was insolvent and within 90 days of the filing of the

petition or within one year, if the transferee was an insider.[1] 11 U.S.C. § 547(b)(4)(B). The purposes of this section are to discourage actions by creditors that might prematurely compel the filing of a petition and to secure an equal distribution of assets among creditors of like class. *Farmers Bank of Clinton, Missouri v. Julian*, 383 F.2d 314, 327 (8th Cir.), *cert. denied*, 389 U.S. 1021, 88 S.Ct. 593, 19 L.Ed.2d 662 (1967). All elements of Section 547(b) must be proven before a transfer will be avoided. The absence of any one of the elements constituting a voidable preference negates the trustee's claim.

Only the element of insolvency is disputed here. To avoid a transfer as preferential, the plaintiff must prove that the debtor was insolvent at the time the allegedly preferential transfer occurred. 11 U.S.C. § 547(b)(3). The Bankruptcy Code defines the term insolvent as a "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation . . . ." 11 U.S.C. § 101(32)(A). Courts often refer to this test as a "balance sheet" test. *See Porter v. Yukon Nat'l Bank*, 866 F.2d 355, 357 (10th Cir.1989); *In re Bellanca Aircraft Corp.*, 56 B.R. 339, 385 (Bankr.D.Minn.1985), *aff'd in relevant part*, 850 F.2d 1275 (8th Cir.1988).

At issue here is the solvency of the debtor's assets on the dates of the loan payments to Scientific. Courts often utilize the well-established bankruptcy principles of "retrojection" and "projection," which provide for the use of evidence of insolvency on a date before and after the preference date as competent evidence of the debtor's insolvency on the preference date. *In re Arrowhead Gardens, Inc.*, 32 B.R. 296, 301 (Bankr.D.Mass. 1983), *aff'd*, 776 F.2d 379 (1st Cir.1985); *Inter–State Nat'l Bank of Kansas City v. Luther*, 221 F.2d 382 (10th Cir.1955), *cert. dismissed*, 350 U.S. 944, 76 S.Ct. 297, 100 L.Ed. 823 (1956). The bankruptcy court evaluated Mama D'Angelo's assets and liabilities as of July 31, 1989. Neither party takes issue

---

**1.** Scientific was an insider of Mama D'Angelo as defined by 11 U.S.C. § 101(31)(E) because it was an affiliate under 11 U.S.C. § 101(2)(B).

with the retrojection from this date to the determination of solvency as of the July 25, 1989 transfer nor with the projection from this date to the determination of solvency as of the September 15, 1989 transfer.[2] The parties disagree only as to whether the July 31, 1989 valuation is clearly erroneous.

The bankruptcy court found that the debtor was insolvent on July 31, 1989.

> I believe [the debtor] was a going concern and solvent … until on or about July 4, 1989. * * * [A]s of that date because the product could not be produced the company was dead on its feet, and was not a going concern. * * * And thus it not being a going concern the liquidation values … must be used. And as of that date the company was insolvent in that its debts exceeded it assets at fair value.

Bankruptcy Ct.Tr.Vol. III at 82–83.

▇ The bankruptcy court's determination that the debtor was insolvent at the time of the allegedly preferential transfers is a finding of fact subject to the clearly erroneous standard of review. *Clay v. Traders Bank of Kansas City,* 708 F.2d 1347, 1350 (8th Cir.1983); *In re Mullet,* 817 F.2d 677, 678–79 (10th Cir.1987); *In re: G.S.F. Corp.,* 938 F.2d 1467, 1474 (1st Cir.1991) (A court of appeals reviews for clear error the bankruptcy court's findings of facts, not the contrary findings of the district court). A finding of fact is clearly erroneous only if the court has "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data."

*Krasnov v. Dinan,* 465 F.2d 1298, 1302 (3d Cir.1972).

The district court determined that the bankruptcy court's finding of insolvency was clearly erroneous because the debtor was not valued as a going concern:

> This court has a definite and firm conviction that a mistake was made in the bankruptcy proceeding and based upon the evidence that was before it, the payment of debts as they became due, without question substantial business was being conducted during the periods of time adding up to many thousands of dollars, I think $800,000 in business, some such figure, convinces the court that even though by hind site (sic) it may be said that this was not a going concern, it in fact was at the time of the alleged preference a going concern as a matter of law."

Dist.Ct.Tr.Vol. III at 2–3. We disagree. Finding no clear error in the determination that the debtor was not a going concern and, accordingly,[3] that the debtor was insolvent, we affirm.

### III.

Scientific Research Products contends that continuous product sales and timely payment of debts qualify a debtor for going concern status. But there is no talismanic inquiry; we must review the entire financial picture of the debtor. *See Porter,* 866 F.2d at 357. Upon review, we are persuaded that the bankruptcy court's finding that the debtor had no going concern value is well supported by the evidence and is not clearly erroneous.

▇ It is well-settled that if a company is only nominally extant, to treat it as a going concern would be misleading and would fictionalize the company's true financial condition. *In re Randall Constr. Inc.,* 20 B.R. 179, 184 (D.N.D.1981). Liquidation value is appropriate "if at the time in question the

---

2. There were no substantial transactions between July 25, 1989, the date of the first loan repayment from Mama D'Angelo to Scientific, and July 31, 1989. The only change in Mama D'Angelo's circumstances between July 25, 1989 and September 15, 1989, the date of the second transfer, was the company's increased insolvency.

3. Scientific concedes that, if liquidation value is appropriate here, *i.e.,* if Mama D'Angelo was not a going concern, the company was insolvent on the date of the transfers.

business is so close to shutting its doors that a going concern standard is unrealistic." *In re Vadnais Lumber Supply, Inc.*, 100 B.R. 127, 131 (Bankr.D.Mass.1989); *Matter of Taxman Clothing Co., Inc.*, 905 F.2d 166, 170 (7th Cir.1990); *Mitchell v. Investment Securities Corp.*, 67 F.2d 669, 671–72 (5th Cir. 1933). The debtor fit that description on July 31, 1989.

■ The record evidence suggests that inherent defects in nearly all aspects of the manufacturing process precluded the company from producing the product it intended to sell. As Mr. Phelan explained, manufacturing processes and components that were "absolutely essential ... did not work." Although the debtor managed to sell some pizzas, sales were a minute fraction of the level required to break even. To be sure, a business need not be thriving to receive a going concern value. *In re Bellanca Aircraft Corp.*, 56 B.R. at 387 (company still manufacturing and selling its product line despite increasing debt load and a deteriorating financial condition). However, it must have had a realistic capacity to manufacture and sell its product; a going concern valuation is appropriate only if it is believed that the enterprise will continue as a going concern. *See In re Art Shirt Ltd., Inc.*, 93 B.R. 333, 341 (E.D.Pa.1988).

The debtor also was plagued with enormous and continuous operating losses both before and after it moved to the new facility. The operating loss through June was $2,087,-156. The total loss for 1989 was $5,271,550. In the month of July alone, the debtor lost in excess of $1,500,000 dollars. More important, the debtor had no prospect for business recovery. This was no longer a start-up operation; this futuristic facility was engineered and expected to produce one profitable pizza per second. Failing this, the company would fail. It did.

We are mindful of the authority to the effect that fair valuation ordinarily must be made from the vantage of a going concern and that subsequent dismemberment should not enter into the picture. *See 2 Collier on Bankruptcy* ¶ 101.32 (1995); *Cissell v. First Nat'l Bank of Cincinnati*, 476 F.Supp. 474, 484 (S.D. Ohio 1979) (a company's assets must be valued at the time of the alleged transfer and not at what they turned out to be worth at some time after the bankruptcy intervened); *Mutual Sav. & Loan Ass'n v. McCants*, 183 F.2d 423 (4th Cir.1950). But we "may consider information originating subsequent to the transfer date if it tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date." *In re Chemical Separations Corp.*, 38 B.R. 890, 895–96 (Bankr.E.D.Tenn.1984). Thus, it is not improper hindsight for a court to attribute current circumstances which may be more correctly defined as current awareness or current discovery of the existence of a previous set of circumstances. In this case, even Scientific's witnesses acknowledge a current "discovery" or "awareness" of circumstances then in existence: "most of the problems were inherent with the original construction of the plant which, you, would have been there as of [the] day we moved into the plant," and management had "stuck millions upon millions of dollars fruitlessly into this facility." Circumstances did not change between July and the November shut-down date; it simply took management a few months to "discover" and became "aware" of those circumstances that existed beginning in July.

Finally, the company had a deficiency in working capital because Allen ceased making substantial contributions and instead made only loans. The debtor continued to operate, not on the basis of adequate income from its sales, not on the basis of capital contributions from shareholders, but solely on the basis of massive loans from Allen. This is a distinction with a profound difference. Allen was not infusing capital into his moribund company. He continued to lend it money, thus becoming a creditor and not a holder of equity, and thus affecting the security of the corporate balance sheet by increasing liabilities over assets. For this reason, it is of little import that Mama D'Angelo was current on all of its major debts and payments. This is not the test of insolvency, nor is it the test of a going concern. *See In re Winkle*, 128 B.R. 529, 537 (Bankr.S.D. Ohio 1991) ("[W]hether Mr. Winkle could still make payments on his debts ... is irrelevant.").

Mama D'Angelo was current on its debts only because Allen continued to lend it money. With each Allen loan, the corporate balance sheet worsened.

Had Allen's 1989 loans been contributions to the corporation's capital and constituted additions to his shareholder's equity, the balance sheet would have presented a far different picture. For reasons best known to Allen, or to his tax adviser, the decision was made to make loans only, thus making him a creditor rather than an equity holder, and thus making moribund the corporate state of affairs. According to the trustee's accountant Robison, from July through October Mama D'Angelo had sales income of only $866,431 while costs of sales amounted to $1,866,115 and net operating losses of $3,184,394. Its doors remained open only because it continued to increase its corporate debt by borrowing from Allen, the man who owned 96 percent of its stock.

The bankruptcy court conducted the necessary appraisal of Mama D'Angelo based on the evidence of record indicating that, at the time of the repayment of the Scientific loans of July and September, it was insolvent and therefore no longer a going concern. We give substantial leeway on questions of valuation:

> [T]he matrix within which questions of solvency and valuation exist in bankruptcy demands that there be no rigid approach taken to the subject. Because the value of property varies with time and circumstances, the finder of fact must be free to arrive at the "fair valuation" defined in [§ 101(32)] by the most appropriate means.

*Porter,* 866 F.2d at 357. The bankruptcy court's findings are not clearly erroneous.

The judgment of the district court is reversed and the proceedings remanded to the district court with a direction to enter judgment affirming the bankruptcy court order.