In re C. Glenn **CANTRELL,** also known as Cloyse Glenn Cantrell, also known as Glenn Cantrell; and Kyleen Jane Cantrell, Debtors.

**BANK OF WESTERN OKLAHOMA,**
**Plaintiff–Appellee,**

v.

C. Glenn **CANTRELL,** also known as Cloyse Glenn Cantrell, also known as Glenn Cantrell, Defendant–Appellant.

BAP No. WO–96–47.
Bankruptcy No. 95–15151–BH.
Adv. No. 95–1342.

United States Bankruptcy Appellate Panel of the Tenth Circuit.

May 23, 1997.

Timothy Kline and Scott C. Sublett of Kline & Kline, Oklahoma City, OK, for Defendant–Appellant.

James H. Bellingham of McClelland, Collins, Bailey, Bellingham & Loyd, Oklahoma

City, OK, and Mark W. Albert of Albert & Albert, Elk City, OK, for Plaintiff–Appellee.

Before PUSATERI, CLARK, and ROBINSON, Bankruptcy Judges.

## OPINION

JAMES A. PUSATERI, Chief Judge.

Debtor C. Glenn Cantrell appeals a bankruptcy court decision, entered after a bench trial, concluding that his debt to the Bank of Western Oklahoma ("BOWO") is nondischargeable pursuant to 11 U.S.C. § 523(a)(6). Mr. Cantrell asks us to determine whether the bankruptcy court erred in: (1) finding his debt was for "willful and malicious injury" to BOWO's property; (2) finding the debt was for "willful and malicious injury" even though BOWO's officers had to know what he was doing and implicitly consented to his actions; and (3) declining to enter a judgment specifying the amount of his nondischargeable debt. For the reasons stated below, we affirm the bankruptcy court's decision.[1]

### I. Background

Debtor C. Glenn Cantrell ("Cantrell") ran a large cow-calf operation, making most of his income from selling calves produced each year by his breeding cattle. The First National Bank of Chicksha ("FNB") had a first lien on his cattle herd. In 1992, he began borrowing money from BOWO as well. By December 1993, he owed BOWO $593,750 on a cattle loan, and had a $175,000 operating loan or line of credit; both loans were secured by his cattle herd and certain real estate. Cantrell was to pay off FNB's loan with part of BOWO's cattle loan, but paid an unsecured debt instead, leaving BOWO holding a second lien on his cattle.

Consistent with industry standards, Cantrell's agreement with BOWO provided that he was to give BOWO the proceeds when he sold its collateral, and to arrange for buyers to pay him with checks made payable to him and BOWO. This way, he could spend the proceeds only with BOWO's permission.

Once, when he told BOWO he had paid it with a loan from a third party, BOWO allowed him to use some sale proceeds to repay that party. This was the only time BOWO gave him permission to use sale proceeds to pay someone besides the bank.

Cantrell sought to renew and expand the operating loan for 1995. BOWO renewed the loan but declined to increase its $175,000 limit. Apparently, this left only about $5,000 of credit available on the loan. BOWO's chief financial and operating officers were cattlemen with substantial knowledge of the cattle business. They were, of course, aware that Cantrell could only obtain about $5,000 for his 1995 operations under the operating loan. However, Cantrell has directed us to no evidence in the record which demonstrates these officers (or any other BOWO employees) knew that except for his adult cattle, Cantrell then had no calves or assets he could sell, or other source he could tap, to obtain the money he might need to continue his business.

During 1994 and 1995, Cantrell sold many of his breeding cattle. He used some of the proceeds to repay the third party as noted above and deposited some with BOWO. He made another sale to another third party which led to a dispute that BOWO settled, obtaining some money for the cattle, though not as much as Cantrell claimed it should have. Finally, he also received $272,274.42 in sale proceeds which he spent without BOWO's permission and without paying down FNB's competing loan. BOWO based its dischargeability complaint on Cantrell's unauthorized disposition of this money. After Cantrell filed for bankruptcy, BOWO liquidated its remaining collateral, leaving it with a claim for $144,794.26.

At trial, BOWO relied solely on § 523(a)(6), which excepts from discharge a debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The bankruptcy court ruled orally at the end of the trial. It quickly

---

1. After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal, and grants Mr. Cantrell's request for a decision on the briefs. *See* Fed.R.Bankr.P. 8012; 10th Cir. BAP L.R. 8012–1(a). The case is therefore submitted without oral argument.

disposed of the willfulness requirement, saying,

> [T]he act being claimed [sic] of here is the sale of the cattle without remittance of the proceeds to the plaintiff bank. There's no question that that was a willful act of Mr. Cantrell, because he knew ... he was selling the cattle, and he knew he wasn't paying the plaintiff. In virtually all of these cases, the willfulness part of its pretty much goes without saying, because you don't ... sell cattle unknowingly.

The court then discussed the maliciousness requirement at some length, initially noting that it felt the word "malice," as shown by various dictionary definitions, indicated an act that was done with ill will or was morally wrong. The court said, "I'm unable to find that [Cantrell] had any desire to injure the plaintiff bank, that he had any active ill will against it, or any hatred of it. He just sold the cattle and did something with the money other than to remit it to the bank." Ultimately, however, the court turned to Tenth Circuit decisions which have discussed the meaning of "malicious" in § 523(a)(6). Interspersing quotations from *C.I.T. Fin. Servs. v. Posta (In re Posta)*, 866 F.2d 364 (10th Cir. 1989), with its comments about applying the decision to the case at hand, the court said:

> "Malicious intent is demonstrated by evidence that the debtor had knowledge of the creditor's rights," which he did—he knew these cattle were pledged—"and that with that knowledge proceeded to take action in violation of those rights."
>
> Well, he had the knowledge that the bank had a security interest, and with that knowledge proceeded to sell the cattle without consent and without paying the money to the bank. The Court goes on:
>
> "Such knowledge can be inferred from the debtor's experience in the business"—he was well experienced—"his concealment of the sale"—he did conceal the sale—"or by his admission that he has read and understood the security agreement."
>
> There's no question but that he knew the security agreement said the cattle were pledged.

The court also discussed and quoted from *Dorr, Bentley & Pecha v. Pasek (In re Pa-*

*sek)*, 983 F.2d 1524 (10th Cir.1993), saying the decision was the last Tenth Circuit ruling on the issue of which it was aware. The court concluded *Pasek* clearly declared that *Posta* was still the Circuit's rule about the meaning of "malicious."

After the court concluded the debt was nondischargeable, Cantrell's counsel asked about the amount of the debt. The court said, "I don't think that's the function of the bankruptcy court to determine that," and indicated the amount could be determined in a foreclosure proceeding that was apparently pending in state court.

## II. Standard of Review

In reviewing an order of the bankruptcy court, an appellate court "reviews the factual determinations of the bankruptcy court under the clearly erroneous standard, and reviews the bankruptcy court's construction of [a statute] de novo." *Taylor v. I.R.S.* 69 F.3d 411, 415 (10th Cir.1995) (citations omitted).

> A finding of fact is clearly erroneous only if the court has "the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "It is the responsibility of an appellate court to accept the ultimate factual determination of the fact-finder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data." *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir.1972).

*Gillman v. Scientific Research Prods. (In re Mama D'Angelo, Inc.)*, 55 F.3d 552, 555 (10th Cir.1995).

## III. Discussion

Cantrell argues that the word "willful" in § 523(a)(6) requires a finding that the debtor intended to injure the creditor or the creditor's property and the word "malicious" requires a finding that the debtor's intent to injure had the quality of ill will, or evil or mischievous motives. Since the bankruptcy

court found he had no intent to injure BOWO, he continues, his debt should be dischargeable. We disagree, and conclude that the bankruptcy court correctly applied the Tenth Circuit's decisions interpreting § 523(a)(6).

■ In *Posta*, where the bankruptcy court appropriately began its discussion of the dischargeability of Cantrell's debt to BOWO, the Tenth Circuit said, " 'Willful' conduct is conduct that is volitional and deliberate and over which the debtor exercises meaningful control, as opposed to unintentional or accidental conduct." 866 F.2d at 367. No intent to injure is required under this interpretation. We do not believe the Circuit deviated from this view in *Pasek*, its latest decision on the subject. *See* 983 F.2d at 1527. We certainly cannot say the bankruptcy court's factual determination that Cantrell's actions in selling cattle which were subject to BOWO's security interest without remitting the proceeds to the bank was "willful" was clearly erroneous.

■ For a secured creditor complaining the debtor has sold its collateral and converted the proceeds rather than remitting them to the creditor, *Posta* and *Pasek* make clear that the maliciousness required by § 523(a)(6) can be established by showing the debtor had knowledge of the creditor's rights and, without justification or excuse, proceeded to act in violation of those rights, and it was at least reasonably foreseeable the debtor's act would injure the creditor. *See* 983 F.2d at 1527–28, 866 F.2d at 367–68. The bankruptcy court properly distilled this test from the cases, and its findings that Cantrell was experienced in business, concealed the sales from BOWO, and knew what BOWO's security agreement said are not clearly erroneous.

■ Cantrell also argues that BOWO's officers necessarily knew he was selling off adult cattle to fund his operations because they were experienced cattlemen and he had only $5,000 of credit left on his operating loan for 1995. Some of his improper sales and conversion of proceeds occurred in 1994, so the availability of credit on the loan in 1995 can have no bearing on the propriety of those sales. As indicated above, Cantrell has pointed to no evidence in the record that demonstrates BOWO's officers knew he had no other source of revenue in 1995 than selling his breeding cattle. Consequently, the bankruptcy court's conclusion that BOWO did not know about or consent to these sales cannot be clearly erroneous. Even if we were inclined to believe BOWO's officers should have known Cantrell was selling off some of his herd, we would not go so far as to hold the bank implicitly consented to his sale of over $270,000 worth of cattle and use of the proceeds to pay anyone other than BOWO or at least the first lien holder.

■ Finally, Cantrell complains that the bankruptcy court was obliged to enter a judgment fixing the amount of his debt to BOWO once it found the debt to be nondischargeable. We have some difficulty understanding his argument. He asserts in his opening brief that the court's ruling "by default held the entire amount of the debt" to be nondischargeable, and in his reply brief contends the nondischargeable "amount of the debt is limited to the lesser of the value of the collateral converted or the amount of the debt outstanding." Yet, at trial, the evidence showed Cantrell had converted over $270,000 in proceeds of cattle sales and BOWO conceded its dischargeability claim was limited to the balance of about $144,000 then owed to it. On appeal, both parties cite *First of America Bank v. Afonica (In re Afonica)*, 174 B.R. 242, 247 (Bankr.N.D.Ohio 1994), for the rule that a judgment for converting a secured creditor's collateral should be limited to the lesser of the value of the converted property or the amount of the debt. Thus, it seems BOWO agrees with Cantrell that the nondischargeable debt he owes it is limited to the principal balance left after it liquidated its remaining collateral.

Cantrell cites no authority which holds that a bankruptcy court must fix the amount of the debt which it has determined is nondischargeable. In *Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017–18 (9th Cir. 1997), the court rejected the converse argument that a bankruptcy court does not have jurisdiction to enter a judgment declaring the amount of the nondischargeable debt. In

dicta, the court indicated a bankruptcy court could require a creditor whose claim has not been reduced to judgment to obtain stay relief, prosecute its fraud claim to judgment in state court, and then return to bankruptcy court for a determination of the dischargeability of any judgment obtained. *Id.* at 1017. While many bankruptcy courts do enter judgments fixing the amount of debts they have determined to be nondischargeable, we do not believe it was reversible error for the court to decline to do so here. A state court foreclosure proceeding was pending in which this determination could easily be made. If Cantrell is aggrieved by that court's decision, he can appeal it just as he has the bankruptcy court's decision on the dischargeability question.

## IV. Conclusion

The bankruptcy court's decision is affirmed.