**In re Paul Eugene VASSAU and Julie Ann Vassau, Debtors.**

**Leslie T. Gladstone, Chapter 7 Trustee, Plaintiff,**

v.

**Bank of America, N.A., Defendant.**

**Bankruptcy No. 09–09536–PB7.**

**Adversary No. 11–90280–PB.**

United States Bankruptcy Court, S.D. California.

Sept. 25, 2013.

Christin A. Batt, Financial Law Group, La Jolla, CA, for Plaintiff.

Tami Crosby, Miles, Bauer, Bergstrom & Winters LLP, Santa Ana, CA, for Defendant.

## ORDER ON TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

PETER W. BOWIE, Bankruptcy Judge.

The facts of this case are neither uncommon nor disputed. When this case was filed, and during the ninety days before, Debtors' residence was subject to two deeds of trust securing obligations to two creditors-the Senior Lienholder and Junior Lienholder. The property was worth more than the claim of the Senior Lienholder, but less than the claims of Senior Lienholder and Junior Lienholder combined. In other words, the Senior Lienholder was fully secured and the Junior Lienholder was partially secured.

Debtors fell behind on their payments to Senior Lienholder. Within the 90 days prior to the petition, the Debtors made ten payments to the Senior Lienholder.

Though the transfers were made to the Senior Lienholder, Trustee seeks to avoid the transfers on the theory that they were preferences as to the Junior Lienholder. The Trustee and the Junior Lienholder have both moved for summary judgment. This Order addresses the Trustee's motion.

## BACKGROUND

Paul Eugene Vassau and Julie Ann Vassau (Debtors) filed their petition on July 1, 2009. Leslie Gladstone was appointed chapter 7 trustee (Trustee). Debtors scheduled the real property located at 7071 Rose Drive, Carlsbad, California 92001 (the "Property"). As of the petition date, the Property was worth approximately $1.1 million dollars.[1]

At all times relevant to this matter, the Property was subject to a first priority lien in favor of Bank of America (as successor in interest of Countrywide Bank) ("Senior Lienholder") under Loan No. –3720, and a second priority lien in favor of Bank of America (as successor in interest of Countrywide Bank) ("Junior Lienholder") under Loan No. 3728.[2] Prior to the payments discussed below, the amount owed to the Senior Lienholder was approximately $987,920.00, and the amount owed to Junior Lienholder was approximately $264,717.21. Given the $1.1 million value of the Property, the claim of the Senior Lienholder was fully secured, while the claim of the Junior Lienholder was only partially secured.

During the 90 days before the date the petition was filed, the Debtors made ten payments to the Senior Lienholder totalling $41,716.45 (the "Transfers"). The Transfers were applied to interest charges, late charges, the negative escrow balance and miscellaneous charges, all of which would be secured under the senior deed of trust. Had the Transfers not been made, the fully secured claim of the Senior Lienholder would have been greater by $41,716.45.

## DISCUSSION

The Transfers were all made to the Senior Lienholder—no transfers were made to the Junior Lienholder. Nevertheless, the Trustee seeks to avoid the Transfers on the theory that they were preferential transfers as to the Junior Lienholder. As the Trustee explains:

Senior Lienholder, but only partially secure Junior Lienholder.

1. The Trustee contends the value of the Property is $1,156,000. Junior Lienholder has it at $1,063,900. For the purpose of this preference action, it is of no import which is correct. The only thing that matters is that there is sufficient value to fully secure the claim of

2. While BofA holds the senior lien and the junior, BofA is the Defendant in this action only as the Junior Lienholder.

Defendant Junior Lienholder benefitted from the Transfers because the effect of the Transfers was to reduce the amount of the Senior Lienholder's secured claim on the Real Property and correspondingly increase the value of Defendant's security interest in the Real Property. That is, had the Transfers not been made the amount of the fully secured claim of the Senior Lienholder would be $41,716.45 greater. That $41,716.45 would reduce the amount by which the claim of Junior Lienholder was secured dollar for dollar. The Transfers reduced Senior Lienholder's secured claim and correspondingly increased that of Junior Lienholder dollar for dollar.[3]

In order to avoid a transfer as a preference, a trustee must establish each of the requirements of Bankruptcy Code § 547(b), which provides:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The Junior Lienholder concedes that a transfer of an interest of the Debtors in property was made and that elements (b)(2), (3) and (4) are established. The Junior Lienholder contests elements (b)(1) and (5). Junior Lienholder also asserts § 547(i) as a sort of defense.

**Section 547(i)**

■ Junior Lienholder's first argument is based upon a misunderstanding of § 547(i). That subsection provides:

(i) If the trustee avoids under subsection (b) a transfer made between 90 days and 1 year before the date of the filing of the petition, by the debtor to an entity that is not an insider for the benefit of a creditor that is an insider, such transfer shall be considered to be avoided under this section only with respect to the creditor that is an insider.

The Trustee's theory in this case, and that contemplated under § 547(i) are similar in that they both deal with a situation in which a transfer is preferential to one party, but not another. That, though, is where the similarity ends. Citing § 547(i), Junior Lienholder argues "Non-insiders who indirectly benefit from a payment by the debtor are not liable for a preference." That is not what § 547(i) says.

First, the Transfers the Trustee seeks to avoid were not made "between 90 days and 1 year" before the petition, they were made within 90 days. Second, neither Senior Lienholder nor Junior Lienholder are insiders.

Subsection 547(i) applies to the situation where an transfer is made to a non-insider, but indirectly benefits an insider. The

---

**3.** Put another way, but for the Transfers, Junior Lienholder would have a secured claim of X and an unsecured claim of Y. Due to the Transfers, Junior Lienholder has a secured claim of X plus $41,716.45 and an unsecured claim of Y minus $41,716.45.

transfer may be a preference as to the insider, to whom the one-year look back period applies, but not the non-insider, who is protected by the 90–day look back period. That is not the situation we have in this case. Section 547(i) simply does not apply to the facts of our case.

**(b)(1) to or for the benefit of a creditor;**

■ Junior Lienholder concedes, as it must, that as of the date of the Transfers, it was a creditor of the Debtors. It denies, however, that the Transfers were made for its benefit. It is not entirely clear, but it appears Junior Lienholder's argument is that the Transfers do not satisfy § 547(b)(5), because the Debtors did not intend that the Transfers benefit it. This misunderstanding is understandable. In the absence of case law to the contrary, the word "for" in the phrase "for the benefit of a creditor," could be read to require the debtor make the transfer with the intent of benefitting the creditor. However, there is in fact ample case law to the contrary. Indeed, it is well established that the intent of the parties is irrelevant to the preference analysis.

Professor Vern Countryman explained in his comprehensive article, "The Concept of a Voidable Preference in Bankruptcy," that intent on the part of the debtor has not been an element of preference since 1910, and intent on the part of the transferee or beneficiary was removed as of 1978. 38 Vand.L.Rev. 713, 722–23; 726 (1985).

The court in *In re Phelps Technologies, Inc.*, elaborated:

> what the parties might have intended is immaterial. Because a preference " 'is an infraction of the rule of equal distribution among all creditors,' ... neither the intent nor motive of the parties is relevant in consideration of an alleged preference under § 547(b)." *Matter of Criswell*, 102 F.3d 1411, 1414 (5th Cir. 1997) (quoting 4 collier On Bankruptcy

¶ 547.01, at 547–12, 13 (15th ed. 1996)). "[I]t is the effect of the transaction, rather than the debtor's or creditor's *intent*, that is controlling." 5 collier On Bankruptcy ¶ 547.01, at 547–14, 15 (15th ed. 1999)(emphasis in original). See also, *Corporate Food Management, Inc. v. Suffolk Community College (In re Corporate Food Management, Inc.)*, 223 B.R. 635, 641 (Bankr.E.D.N.Y.1998). Therefore, what the parties might have intended to accomplish in this instance is immaterial; the effect of what was done is controlling.

245 B.R. 858, 867 (Bankr.W.D.Mo.2000).

■ Thus, § 547(b)(1) cannot be read to require an intent to benefit. Rather, "for the benefit of a creditor," merely requires that the transfer actually benefitted the creditor. In the case at hand it is clear the Junior Lienholder benefitted from the Transfers. The effect of the Transfers was to increase the equity in the Property available to secure the claim of Junior Lienholder. Due to the Transfers, Junior Lienholder has a larger secured claim, and a correspondingly smaller unsecured claim in this bankruptcy case. The impact of the Transfers is the same as if Debtors had pledged new collateral worth $41,716.45.

On facts very similar to the ones at hand the Seventh Circuit held that transfers to a senior lienholder benefitted the junior lienholder:

> Gateway as junior lienholder benefitted from the improvement in Marine's position. The bankruptcy court found that as Marine's debt secured by the East Washington store inventory decreased, Gateway's security was thereby increased dollar for dollar. This, the court determined, resulted in an indirect preferential transfer to Gateway to the extent the amount transferred to Marine reduced the fund for payment to other

creditors with unsecured claims. The court found Gateway to have been indirectly preferred in the amount of $59,-643.71—the amount by which Marine's security exceeded its claim.

*In the Matter of Prescott,* 805 F.2d 719, 723 (7th Cir.1986).

The Court finds that the Transfers benefitted Junior Lienholder, and that § 547(b)(1) has been satisfied.

**(b)(5) "that enables such creditor to receive more than such creditor would receive if the case were a case under chapter 7**

■ The Court has struggled with how this element is to be applied. Though the term "liquidation" is not included in the statute, this is often referred to as the hypothetical liquidation test, and appears to be applied by conducting a hypothetical liquidation, in which the hypothetical trustee sells all of the non-exempt assets of the estate, and distributes the proceeds according to the priority scheme under the Code. Many courts applying this element use the term "liquidation" for "a case under chapter 7 of this title." For example, the Tenth Circuit set out the elements of preference as follows:

> Bankruptcy Code § 547(b), 11 U.S.C. § 547(b), provides that a trustee may avoid the transfer of a debtor's interest in property: (1) to a creditor; (2) for an antecedent debt; (3) made while the debtor was insolvent; (4) within ninety days of the filing of a petition for relief in bankruptcy; (5) that enables the creditor to receive more than the creditor would receive if the transfer had not been made and the debtor's estate were *liquidated* under Chapter 7 of the Bankruptcy Code.

*Porter v. Yukon National Bank,* 866 F.2d 355, 356 (10th Cir.1989)(emphasis added). See also, *In re Johnson Memorial Hosp., Inc.,* 470 B.R. 119, 123 (Bankr.D.Conn. 2012) ("hypothetical Chapter 7 liquidation

..."); *In re Frankum,* 453 B.R. 352, 367 (Bankr.E.D.Ark.2011) (".... the 'hypothetical Chapter 7 test.' This test provides that a preference exists only if the transferred property enables the creditor to receive more than it otherwise would under a Chapter 7 liquidation of the debtor's estate."); *In re Property Leasing & Management,* 46 B.R. 903, 911 (Bankr. E.D.Tenn.1985) ("the determinative inquiry regards the final element of a preferential transfer under § 547(b)—i.e., whether [undersecured creditor] received more as a result of the Payments than it would otherwise have received under a chapter 7 liquidation ...")

This approach appears to be the one taken by the court in *Prescott,* discussed above. In that case the court held that the trustee met his burden under § 547(b)(5) simply by establishing that the transferee was undersecured. 805 F.2d at 726.

The potential problem with these cases is that the language of the Code does not say "liquidation." Rather, it provides "(5) that enables such creditor to receive more than such creditor would receive if—(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title." Admittedly, chapter 7 is entitled "Liquidation." However, in practice it is a rare case in which a debtor's assets are actually sold and proceeds paid to creditors. In jumping to a hypothetical liquidation, the courts potentially ignore one of the realities of chapter 7 practice. That is, that chapter 7 trustees rarely liquidate over-encumbered assets. Rather, they are abandoned.

■ Section 704(a)(1) instructs the trustee to "collect and reduce to money the property of the estate ..." However, § 554(a) authorizes a trustee to "abandon any property of the estate that is burdensome to the estate...." A chapter 7 trus-

tee generally will not administer an asset unless it will produce a net return for the estate. When an asset is fully encumbered by a lien, it is considered improper for a chapter 7 trustee to liquidate the asset. See e.g., *In re Preston Lumber Corp.*, 199 B.R. 415 (Bankr.N.D.Cal.1996). Instead, a trustee would abandon the property.

Thus, it seems to the Court that there are at least two approaches possible under § 547(b)(5), each leading to different results in this case. If the hypothetical chapter 7 case element requires a simple hypothetical liquidation, then the Trustee has carried her burden. The Trustee has declared that the assets of the estate are insufficient to pay all unsecured claims in full. Junior Lienholder has not disputed this fact. If the assets were to be sold and distributed as directed, the Property would be sold. The Senior Lienholder would be paid the outstanding balance on its secured claim. To the extent proceeds remained, they would be paid over to Junior Lienholder. Then, to the extent Junior Lienholder's claim was not satisfied, Junior Lienholder would have an unsecured claim, which would share pro rata with the other unsecured creditors, which, according to the Trustee's undisputed evidence, would be less than 100%. Had the Transfers not been made, the secured claim of Senior Lienholder would be larger by the amount of the Transfers, and less would be available to Junior Lienholder on its secured claim, and the amount of the unsecured claim, which is paid less than 100%, would be greater. Hence, the Transfers would result in Junior Lienholder receiving more in the chapter 7 case than they would had the Transfers not been made and the (b)(5) element will have been satisfied.

If, on the other hand, the Court assumes the hypothetical chapter 7 trustee would act as a typical chapter 7 trustee, the result is quite different. As noted, a typi-cal trustee would abandon an overencumbered property. That, in fact, is what the Trustee did in this case. So, the question becomes, what would Junior Lienholder "receive" in the hypothetical chapter 7 case?

Abandoned property ceases to be part of bankruptcy estate and reverts to debtor and stands as if no bankruptcy petition were filed. *In re Dewsnup*, C.A.10 (Utah) 1990, 908 F.2d 588, certiorari granted 498 U.S. 1081, 111 S.Ct. 949, 112 L.Ed.2d 1038, affirmed 502 U.S. 410, 112 S.Ct. 773, 116 L.Ed.2d 903. Liens encumbering property abandoned by the trustee are not affected in any way by the abandonment and the debtor holds title in the same way as prior to the filing of the bankruptcy. *In re Tarpley*, 4 B.R. 145 (Bankr.M.D.Tenn.1980).

An abandonment is not treated as a transfer of property from the estate to the debtor, but rather a reversion. There are, for example, no tax consequences. 26 U.S.C. § 1398(f)(2); *In re Perlman*, 188 B.R. 704 (Bankr.S.D.Fla.1995). So, in a hypothetical abandonment, the lienholder cannot really be considered to "receive" any "payment of such debt" in the chapter 7 case with respect to its secured claim.

An undersecured creditor would receive a distribution, to the extent available, on the unsecured portion of the claim. However, in a Case such as the one at hand, that would actually result in Junior Lienholder receiving less "payment of such debt" in this chapter 7 than if the Transfers had not been made. As discussed above, the Transfers resulted in Junior Lienholder's security interest increasing, with a resulting decrease in the unsecured claim. Since Junior Lienholder would only receive a distribution on the unsecured claim, it is not more and, if any distribution is available, it would be less.

So, the two possible approaches result in opposite results. The Court has found no

express guidance from case law. So far as the Court can determine, no published case discusses the issue. Without binding precedent or persuasion, the Court must decide which of the approaches best achieves the objective of the preference provisions.

■■■ Generally speaking, the purpose of preference law is to avoid inequitable distribution to creditors in similar positions. As Professor Countryman explained:

A policy of preserving classes and of preserving equality within classes does exist, however, and the preference concept is designed to preserve this policy. The function of the preference concept is to avoid prebankruptcy transfers that distort the bankruptcy policy of distribution. Transfers that do distort this policy do so without regard to the state of mind of either the debtor or the preferred creditor.

*Id.* at 748. Collier expresses the same objectives:

The purpose of the preference section is twofold. First, by permitting a trustee to avoid prebankruptcy transfers that occur within a short period before bankruptcy, creditors are discouraged from racing to the courthouse to dismember the debtor during the debtor's slide into bankruptcy . . . . . Second, and more important, the preference provisions facilitate the prime bankruptcy policy of equality of distributions among creditors of the debtor.

Collier on Bankruptcy, 15th Revised Edition ¶ 547.01 (2006).

The primary purpose is to ensure equal treatment for like situated creditors. Though the elements of preference focus on what the transferee or beneficiary received, that is not the harm that preference law is designed to remedy. Every preference involves, by definition, a transfer to an entity that has a claim. The problem is not that a legitimate creditor with an antecedent debt gets paid what he, she or it was owed. What is objectionable, is that in the case of the preference, the payment to one creditor is made at the expense of others. The transfer reduces the assets available to pay other creditors. That is the harm which preference law was designed to remedy.

Looking at our case from the impact on the estate side perspective, we see that the very harm preference law was designed to address did occur in this case. Within the three months before this case was filed, $41,716.45 in cash which might otherwise have been available to pay unsecured creditors, was transferred to Senior Lienholder and those transfers benefitted Junior Lienholder. Whether the Property is sold and the proceeds distributed to the Senior Lienholder and Junior Lienholder, or the Property is abandoned, the result, from the perspective of the estate, is that $41,716.45 which would otherwise be available to unsecured creditors has been removed from their reach to the benefit of Junior Lienholder.

Of the two approaches discussed above, only the hypothetical liquidation allows the Trustee to avoid the Transfers and remedy the harm to the estate.

This is the result reached by other courts when faced with similar facts. In *Prescott,* discussed above, the court upheld a preference judgment against a junior lienholder, based upon transfers to the senior lienholder. 805 F.2d at 729–31.

In *Aulick v. Largent,* 295 F.2d 41 (4th Cir.1961), debtor had sold fraudulent bonds to two claimants A and B. When the fraud was discovered, both demanded satisfaction. A was owed $10,700 and B $3,000, and neither claim was secured. Debtor's solution was to execute a note for $13,700 to B, secured by stock, and have B endorse a note to A for $10,700, all of which occurred within the preference peri-

od. The court held that the transfer of the stock was a preference of $3,000 with respect to B and $10,700 with respect to A.[4]

In our case, the Debtor transferred cash to Senior Lienholder, but the result is the same—a $41,716.45 portion of Junior Lienholder's unsecured claim became secured.

In its supplemental brief, Bank of America argues that payments to a partially secured creditor can only be preferential if they are made on the unsecured portion of the claim. The Court finds no support for such a distinction. Section 547(b)(5) merely requires that such creditor "receive more than such creditor would receive" had the transfer not been made. There is no distinction between secured and unsecured portions of such claims. Bank of America relies upon *Porter v. Yukon National Bank,* 866 F.2d 355 (10th Cir.1989), but that too is unavailing. In fact, the *Porter* case supports the Trustee's position.

In *Porter,* the debtor was in default on an obligation to bank. The claim was secured by shares of stock in a company owned by the debtor, but the value of the security was less than the debt owed, in other words, bank was undersecured. Within the preference period, debtor and bank replaced the note with a new one. Debtor granted bank a security interest in the original stock, plus additional new collateral. The result was that bank went from being partially secured to fully secured. The bankruptcy estate had insufficient assets to pay all creditors in full. The court held that this satisfied § 547(b)(5). At no point did the court hold that only payments made on the unsecured portion of a claim can be a preference.

For these reasons, the Court holds that § 547(b)(5) is met in this case. The Court recognizes that it may be seen as somewhat unfair to require a creditor such as Junior Lienholder to "return" money it never physically "received." We do not know that Junior Lienholder did not ask for the payments to made to the Senior Lienholder, possibly to avert foreclosure. It is possible that a representative of the Junior Lienholder demanded that Debtors make the payments. Of course, as noted above, as a matter of law, intent does not matter. Second, the Trustee, if successful in establishing a preference, is not required to recover from the Junior Lienholder. Under § 550, the Trustee may recover from the "entity for whose benefit such transfer was made," or the "initial transferee." In this case it makes little difference since the Senior Lienholder and Junior Lienholder are the same entity. However, in cases in which they are separate, it seems that a trustee might find it simpler to recover the transfers from the direct transferee.

For all of the reasons discussed, the Court grants the Trustee's motion for summary judgment on the legal issue of whether one, some or all of the Transfers can be preferences as to the Junior Lienholder. Junior Lienholder has raised the defense of ordinary course. This issue is addressed in the separate Order on Junior Lienholder's motion. In short, while Junior Lienholder did not provide sufficient evidence to establish ordinary course for summary judgment, the defense remains viable, and the Court will need additional evidence on the issue.

IT IS SO ORDERED.

---

**4.** *Aulick v. Largent,* was decided under the Act, which required a showing that the transfer enabled the creditor to obtain a greater percentage of his debt than some other creditor of the same class. *Id.* at 45.