In re Jerry M. FRANKUM and Amelia W. Frankum, Debtors.

James C. Luker, Trustee, Plaintiff

v.

Heartland Community Bank, Pulaski Community Bank and Trust Company f/k/a/ First Community Bank and Ruffin & Jarrett Funeral Home, Inc., Defendants.

Bankruptcy No. 1:05–bk–27198.
Adversary No. 1:07–ap–01248.

United States Bankruptcy Court,
E.D. Arkansas,
Batesville Division.

July 18, 2011.

---

Grant E. Fortson, Phyllis M. Jones, Lax, Vaughn, Fortson Jones & Rowe, Little Rock, AR, for Plaintiff.

Rosalind M. Mouser, Ramsay Law Firm, Pine Bluff, AR, Lance Owens, Marshall & Owens, P.A., Jonesboro, AR, Guy Randolph Satterfield, Satterfield Law Firm, Little Rock, AR, for Defendants.

### *ORDER GRANTING MOTION FOR SUMMARY JUDGMENT*

AUDREY R. EVANS, Bankruptcy Judge.

Now before the Court is the *Second Motion for Summary Judgment or, in the alternative, for Partial Summary Judgment* (docket # 35) ("**Motion for Summary Judgment**"), brief in support, and statement of undisputed facts, filed by the Plaintiff–Trustee, James C. Luker ("**Trustee**"). In the Motion for Summary Judgment, the Trustee alleges that a $500,000 payment made to Defendant, Heartland Community Bank ("**Heartland**"), out of funds in which the Debtors have an interest, constituted a preferential transfer subject to avoidance under 11 U.S.C. § 547.[1]

---

1. All statutory references herein are to Title 11 of the United States Bankruptcy Code,

The Motion for Summary Judgment does not make any specific request for relief regarding the other two Defendants in this case, Iberiabank f/k/a Pulaski Bank and Trust Company f/k/a First Community Bank ("**Pulaski Bank**"), or Ruffin and Jarrett Funeral Home, Inc. ("**Ruffin**"). Heartland and Ruffin each filed separate responses to the Motion for Summary Judgment, briefs in support, and statements of undisputed facts. The Court finds that summary judgment is appropriate in this matter, and grants the Motion for Summary Judgment.

## OVERVIEW

The Debtors in this bankruptcy case are Jerry M. Frankum and Amelia Frankum. Jerry Frankum is a doctor, and the Debtors owned several medical facilities, including Rivercrest Nursing Home, Jefferson Nursing Home, and Newport Hospital and Clinic ("**Newport Hospital**"). The Rivercrest Nursing Home was financed by Heartland; the Jefferson Nursing Home was financed by Heartland and Ruffin; and the Newport Hospital was financed by Heritage Bank which later assigned its note and security interest to Pulaski Bank. From 2002 to 2004, the Debtors fell behind on their obligations to Heartland and Ruffin. These loans went into default, and Heartland and Ruffin filed several lawsuits to collect on the debts. These lawsuits resulted in a settlement agreement under which each creditor took a security interest in some of the Debtors' stock in Newport Hospital, and obtained a right to vote those stocks. The settlement agreement also gave the Debtors a deadline of December 1, 2004, to cure the deficiencies on the loans. If the Debtors did not cure those deficiencies by the stated date, the settlement agreements authorized Heart-

land and Ruffin to file pre-signed consent judgments in the lawsuits. The Debtors failed to cure the deficiencies within the time stated, and Heartland and Ruffin both entered the pre-signed consent judgments in the lawsuits. Based on its consent judgment, Heartland had a writ of execution issued to obtain additional Newport Hospital stock from the Debtors. Additionally, both Heartland and Ruffin filed their consent judgments in the real estate records of Green and Mississippi counties, but the liens created by those filings were subsequently found to be preferential transfers by the Court's *Order Granting in Part, Denying in Part Motion for Summary Judgment* (docket # 31) ("**Order on First Motion for Summary Judgment**") entered on March 12, 2010.

In 2005, the Debtors attempted to sell substantially all of the assets of Newport Hospital to a company named Community Health Systems, Inc. ("**CHS**"). The Debtors needed the consent of Heartland, Ruffin, and Pulaski Bank (collectively the "**Creditors**") to sell these assets. The Creditors entered into an agreement titled Consent to Sale, under which they agreed to allow the sale to take place provided they received a specified amount from the sale proceeds.

Soon after obtaining the Creditors' consent, Newport Hospital entered into an Asset Purchase Agreement, under which it sold substantially all of its assets to CHS. This agreement provided for a payment of $10,250,000 for the assets, and a separate payment of $250,000 each to Newport Hospital, Jerry Frankum, and Amelia Frankum, in exchange for their agreement not to compete with CHS for five years. The sale closed on September 30, 2005. At that time, CHS paid the agreed amount for both the purchase of the assets and the

unless otherwise noted. All references to rules in this order refer to the Federal Rules of Bankruptcy Procedure unless otherwise indicated.

three covenant-not-to-compete payments. The closing agent, Land Services, Inc. (**"Land Services"**), distributed those funds according to the Master Wire/Payoff Instructions (the **"Wiring Instructions"**) provided by Eugene Zuber. The Wiring Instructions provided each creditor with the payment amount agreed to in the Consent to Sale. Specifically, Heartland received $613,500; Ruffin received $66,500; and Pulaski Bank received $720,000. The payment made to Heartland consisted of a combination of the $500,000 covenant-not-to-compete payments owed to Jerry and Amelia Frankum, and a secondary payment of $113,500 from the sale of the assets of Newport Hospital.

The Debtors filed bankruptcy on October 14, 2005, within 90 days of the sale's closing. The Trustee in the Debtors' bankruptcy case filed this adversary proceeding, pursuant to 11 U.S.C. § 547, to avoid the transfers caused by Ruffin and Heartland placing liens on the Debtors' property in Mississippi and Green counties, and to avoid the transfer of the $500,000 covenant-not-to-compete payments to Heartland. On March 12, 2010, the Court entered its Order on First Motion for Summary Judgment avoiding the liens as preferential transfers, and finding that a genuine issue of material fact existed as to whether the Debtors had a property interest in the transferred covenant-not-to-compete payments. On October 7, 2010, the Trustee filed this Motion for Summary Judgment, providing the Court with additional evidentiary support for the argument that the transfer of the covenant-not-to-compete payments to Heartland was a preferential transfer. Follow-

ing a thorough review of the evidence submitted in support of, and in opposition to, this Motion for Summary Judgment, the Court finds that the Debtors did have a property interest in the covenant-not-to-compete payments and grants the Trustee's Motion for Summary Judgment.

## EVIDENCE[2]

■ The following evidence was provided as support for, or in response to, the Motion for Summary Judgment and was relied on by the Court in making this determination:

1. The affidavit of James C. Luker, the Trustee in the Debtors' bankruptcy case (the **"Luker Affidavit"**).

2. The affidavit of Eugene Zuber, the Hospital Administrator for Newport Hospital and the Debtors' personal advisor (the **"Zuber Affidavit"**).

3. The affidavit of Robert Smith, the attorney for Newport Hospital with respect to the Asset Purchase Agreement (the **"Smith Affidavit"**).

4. The affidavit of Larry Lewallen, the accountant for both Newport Hospital and the Debtors (the **"Lewallen Affidavit"**).

5. The affidavit of Clyde H. Henderson, the Chairman and Chief Examining Officer of Heartland (the **"Heartland Affidavit"**).

6. The affidavit of Deborah Sheffield, the Secretary and Treasurer of Ruffin (the **"Ruffin Affidavit"**).

7. The affidavit of Bradley F. Snider, the Executive Vice President of Pulaski Bank (the **"Pulaski Bank Affidavit"**).

---

**2.** In addition to the evidence submitted, the Court takes judicial notice of all filings and records in a case, including the proofs of claim. *See* Fed.R.Evid. 201; *In re Henderson,* 197 B.R. 147, 156 (Bankr.N.D.Ala.1996) ("The court may take judicial notice of its

own orders and of records in a case before the court, and of documents filed in another court.") (citations omitted); *see also In re Penny,* 243 B.R. 720, 723 n. 2 (Bankr. W.D.Ark.2000).

8. An agreement between the Debtors and Heartland Bank for the forbearance of collection activities (the "**Heartland Settlement Agreement**").

9. An agreement between the Debtors and Ruffin for the forbearance of collection activities (the "**Ruffin Settlement Agreement**").

10. A writ of execution by Heartland on the Debtors' stock in Newport Hospital (the "**Writ of Execution**").

11. The agreement between Newport Hospital and CHS for the sale of substantially all of Newport Hospital's assets (the "**Asset Purchase Agreement**").

12. The agreement entered into by Heartland, Ruffin, Pulaski Bank, and the Debtors, providing the creditors' consent to the Asset Purchase Agreement (the "**Consent to Sale Agreement**").

13. The Wiring Instructions for disbursement of funds at closing on Asset Purchase Agreement (the "**Wiring Instructions**").

14. The closing statement of Land Services, showing all payments and disbursements made at the closing of the Asset Purchase Agreement (the "**Closing Statement**").

15. Email correspondence between Robert Smith and counsel for Heartland, Ruffin, and Pulaski Bank (the "**Smith Emails**").

## UNDISPUTED FACTS

Based on the evidence submitted, the parties' statements of undisputed facts, and the facts found to be undisputed in the Order on First Motion for Summary Judgment, the Court finds the following facts are not in dispute:

1. The Debtors borrowed a total of $3,277,944.88 from Heartland Community Bank ("**Heartland**") between 1997 and 2002. This indebtedness consists of two separate loans incurred to purchase the Rivercrest Nursing Home and the Jefferson Nursing Home. The real and personal property of each nursing home secured the respective loans dealing with those properties. (*Heartland Settlement Agreement*).

2. The Debtors borrowed $1,600,000 from Heritage Bank secured by the Debtors' stock in Newport Hospital in 2000. Heritage Bank subsequently assigned this note and security interest to First Community Bank, which later became Pulaski Community Bank and Trust Company, and is now Iberiabank ("**Pulaski Bank**"). (*Pulaski Bank Note and Security Agreement; Pulaski Bank Affidavit*).

3. Jerry M. Frankum personally guaranteed a loan from Ruffin to Rivercrest Nursing Home in the amount of $995,000 in 1997. (*Ruffin Settlement Agreement*).

4. The Debtors defaulted on their obligations to Heartland and Ruffin. As a result, Heartland and Ruffin were involved in three lawsuits to collect on those debts: *Heartland Community Bank v. Jerry M. Frankum, et al.*, Jackson County Circuit No. CV–2004–54 ("**Jackson County Litigation**"); *Jefferson Healthcare, Inc. v. Dr. Jerry W. Frankum, Jr., et al.*, Jefferson County Circuit No. 2004–48–2 ("**Jefferson County Litigation**"); and *Ruffin and Jarrett Funeral Home, Inc. v. Rivercrest Healthcare, Inc., et al.*, Pulaski County Circuit No. CV–2002–5902 ("**Pulaski County Litigation**"). (*Heartland Settlement Agreement*).

5. On September 23, 2004, in exchange for an agreement to cease collection activities, Heartland and the Debtors entered into the Heartland Settlement Agreement. This agreement gave Heartland a security interest in 25% of the outstanding stock in Newport Hospital, and the right to vote that stock. Additionally, the agreement

provided Heartland with pre-signed consent judgments that it could file in each of the pending lawsuits if the Debtors did not cure the loan deficiencies by December 1, 2004. (*Heartland Settlement Agreement* ).

6. On September 30, 2004, the Debtors also entered into the Ruffin Settlement Agreement which gave Ruffin a security interest in 5% of the outstanding stock in Newport Hospital, and a right to vote that stock. Additionally, the Ruffin Settlement Agreement provided Ruffin with a pre-signed consent judgment that it could file in the Pulaski County Litigation if the Debtors did not cure the loan deficiencies by December 1, 2004. (*Ruffin Settlement Agreement* ).

7. The Debtors failed to pay the loan deficiencies by December 1, 2004. Heartland and Ruffin both entered the consent judgments in the lawsuits. (*Heartland Statement of Undisputed Facts 1.E* ).

8. On February 23, 2005, Heartland had a Writ of Execution issued on its consent judgment and obtained additional stock certificates in Newport Hospital. (*Writ of Execution* ).

9. On August 29, 2005, and September 1, 2005, Ruffin recorded its consent judgment in the real estate records of Greene and Mississippi counties.[3] (*Order on First Motion for Summary Judgment* ).

10. In August of 2005, the Debtors had an opportunity to sell substantially all of Newport Hospital's assets to CHS.[4] At this time, the Creditors (Heartland, Ruffin, and Pulaski Bank) collectively held a lien on 100% of the outstanding stock in Newport Hospital. Additionally, Heartland and Ruffin both held a right to vote the stocks they held as collateral. (*Heartland Settlement Agreement; Ruffin Settlement Agreement; Pulaski Bank Note and Security Agreement* ).

11. On August 31, 2005, Heartland, Ruffin, Pulaski Bank, and the Debtors entered into the Consent to Sale Agreement which authorized the Debtors to vote the Newport Hospital stock in favor of the sale to CHS. The Consent to Sale Agreement contained the following conditions and agreements:

● The Creditors were to receive a total of $1,400,000 from the sale. Of this amount, Pulaski Bank was to receive $720,000; Heartland was to receive $613,500; and Ruffin was to receive $66,500.

● Pulaski Bank was to assign its interest in a Note and Security Agreement (which listed Newport Hospital stock as collateral) over to Heartland.

● The Debtors were to grant Heartland a stock power for those stocks that were held as collateral for the security interest transferred from Pulaski Bank to Heartland in this agreement.

(*Consent to Sale Agreement*).

12. Following the Consent to Sale Agreement, Pulaski Bank transferred its interest in the Newport Hospital stock to Heartland. After that transfer, Heartland and Ruffin, collectively, held a security interest in 100% of the stock of Newport Hospital.

13. On September 1, 2005, Newport Hospital, CHS, and the Debtors entered into the Asset Purchase Agreement. (*Asset Purchase Agreement* ).

14. Under the Asset Purchase Agreement, CHS purchased substantially all of

---

**3.** In the Order on First Motion for Summary Judgment, the Court found the liens created by these recordings were preferential transfers under 11 U.S.C. § 547.

**4.** The Asset Purchase Agreement lists National Healthcare of Newport, Inc., as the Buyer. The Zuber Affidavit states that National Healthcare is an entity controlled by CHS.

Newport Hospital's assets for $10,250,000, plus or minus certain undetermined obligations and expenses related to the transaction. (*Asset Purchase Agreement, Sec. 1.5* ).

15. The Debtors were listed in their individual capacities as parties to the Asset Purchase Agreement "for purposes of Section 9 and Section 12.25." Section 9 prohibits Newport Hospital, Jerry Frankum, M.D., and Amelia Frankum from competing with CHS for five years. In exchange, the agreement provides that CHS will pay each of them a $250,000 covenant-not-to-compete payment. Pursuant to section 12.25, the Debtors guaranteed that Newport Hospital would perform its obligations under the agreement. (*Asset Purchase Agreement, Sec. 9, 12.25* ).

16. On September 30, 2005, the parties closed on the Asset Purchase Agreement through Land Services, and CHS wired to Land Services the net proceeds of $10,984,834.55 (the total payment of $11,000,000 was adjusted to account for taxes paid and certain title company charges). (*Closing Statement* ).

17. Eugene Zuber created the Wiring Instructions for the distribution of the proceeds from the sale of the Newport Hospital assets and the covenant-not-to-compete payments. In creating the Wiring Instructions, Mr. Zuber was acting as the Hospital Administrator for Newport Hospital and as the personal representative of the Debtors.[5]

18. Land Services distributed the funds received by CHS according to the Wiring Instructions. The Wiring Instructions specifically required a payment to Pulaski Bank in the amount of $720,000,

and a payment to Ruffin in the amount of $66,500. The Wiring Instructions required a payment of $500,000 to the Debtors for the "Aggregate Non-competition Payment," but a separate instruction then directed that $500,000 be paid to Heartland. The Wiring Instructions also specified a payment to Heartland in the amount of $113,500, for a total of $613,000, as required under the Consent to Sale Agreement. (*Wiring Instructions* ). The Wiring Instructions directed the net sale proceeds be paid to Newport Hospital. (*Closing Statement* ).

19. The Debtors filed their petition for relief under Chapter 7 of the Bankruptcy Code on October 14, 2005 (Case No. 1:05–bk–27198). The Debtors' Summary of Schedules reflects $1,530,230 in assets, and $15,535,471.32 in liabilities.

20. At the time of filing, the Debtors owned 100% of the stock in Newport Hospital, but Heartland and Ruffin, collectively, held a security interest in all of that stock. (*Trustee's Statement of Undisputed Facts 5; Heartland Statement of Undisputed Facts II.B* ).

21. On March 10, 2006, Heartland filed two proofs of claim, Claim No. 12 and Claim No. 13, as unsecured claims in the amount of $1,448,853.41 and $1,373,822.40, respectively. Attachments to those claims explained that Heartland's claims are secured by the Debtors' Newport Hospital stock, but that it listed the claims as unsecured because it could not determine the value of the stock at that time. On November 25, 2009, Heartland amended both claims to reflect a secured status, and adjusted Claim No. 12 to an amount of

---

**5.** Although Heartland disputes that Zuber acted on behalf of the Debtors as their personal advisor, and points to the title he used on the Wiring Instructions to show that he was only acting as the administrator of Newport Hospi-

tal, Heartland offered no evidence to refute Mr. Zuber's affidavit testimony that he signed the Wiring Instructions in both capacities. *See* Fed.R.Civ.P. 56(c), (e).

$1,467,433.31, and Claim No. 13 to an amount of $565,623.98.[6] (*Trustee's Statement of Undisputed Facts 3 & 4; Claim 12; Claim 13* ).

22. On March 10, 2006, Ruffin filed a proof of claim, Claim No. 11, as an unsecured claim in the amount of $885,971.01. On March 13, 2006, Ruffin filed an amended claim, Claim No. 15, in the same amount.[7] (*Claim 11; Claim 15* ).

23. As of June 30, 2010, the Trustee in the Debtors' bankruptcy case was holding funds in the amount of $537,430.52. (*Chapter 7 Trustee's Interim Report* ).

24. The unsecured claims in the Debtors' bankruptcy case, which will receive a *pro rata* distribution of the assets, total more than $4,700,000.[8] (*Luker Affidavit.*)

25. On March 1, 2006, Newport Hospital, which had changed its name to Healthcare Business Solutions, Inc., filed for relief under Chapter 11 of the Bankruptcy Code, Case No. 1:06–bk–10682.[9] On May 11, 2006, Newport Hospital converted its bankruptcy case from Chapter 11 to Chapter 7. (*Petition; Notice of Conversion* ).

26. On August 16, 2007, James C. Luker, the Trustee in the Debtors' bankruptcy case, filed a claim in the Newport Hospital bankruptcy case on behalf of the bankruptcy estate of the Debtors (the **"Stockholder's Claim"**). The claim stated that the Debtors are the sole stockholders of Newport Hospital, and requested a distribution, pursuant to 11 U.S.C. § 726(a)(6), of any remaining surplus of the Newport Hospital estate after paying all of Newport Hospital's other allowable claims.

27. As of September 30, 2010, the trustee for Newport Hospital was holding funds in the amount of $1,272,640.86. (*Newport Trustee's Interim Report* ).

28. On November 2, 2010, the Newport Hospital trustee filed a *Motion for Authority to Make Second Interim Distribution to Unsecured Creditors and Application for Payment of Trustee Second Interim Compensation and Reimbursement of Expenses and Notice* (**"Motion for Distribution"**) in which he proposes to disburse $900,000 toward the Stockholder's Claim. (*Motion for Distribution* ).[10]

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure, as applied to these proceedings through Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment shall be granted where the pleadings, depositions, answers to interrogatories, admissions or affidavits show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[11] *Celotex Corp. v. Catrett,*

---

6. The adjustments to the claim amounts reflect the application of proceeds from the sale of collateral (specifically, the Rivercrest Nursing Home and the Jefferson Nursing Home), and the addition of interest which had accrued on the loans.

7. The only recognizable difference in these claims is that on Claim No. 11 the attorney's signature was cut off, and it is present on Claim No. 15.

8. The Trustee does not specify whether this figure includes the more than $2,000,000 in claims filed by Heartland, which were originally filed as unsecured claims.

9. For purposes of this Order, the Court will continue to refer to Healthcare Business Solutions, Inc., as Newport Hospital.

10. On January 31, 2011, Pulaski Bank filed an objection to the trustee's Motion for Distribution. The parties have requested that this matter not be set for hearing until after the Court's determination on this Motion for Summary Judgment.

11. The legal standard applied herein is based on Fed.R.Civ.P. 56 as it existed when the Motion for Summary Judgment in this case was filed, which is prior to recent amend-

477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Burnette v. Dow Chemical Company*, 849 F.2d 1269, 1273 (10th Cir.1988). A genuine issue of material fact exists if the evidence presented is such that a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The burden is on the moving party to establish the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party to go beyond its pleadings to show that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. The nonmovant may not rely on allegations or denials in its pleadings, but instead an affirmative showing of evidence is required. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. "In determining whether a genuine question of material fact exists, this court is required to view the facts in [the] light most favorable to the nonmoving party...." *In re Gilder*, 225 B.R. 439, 448 (Bankr.E.D.Mo.1998) (citation omitted). However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir.1990). If the non-moving party fails to raise a genuine issue for trial, then it is appropriate for the court to resolve the matter on summary judgment despite the measure of intricate analysis required to apply those undisputed facts to the law.

## DISCUSSION

■■■ As a general rule, the trustee may avoid a transfer made by the debtor within ninety days prior to the filing of a bankruptcy petition as a preferential transfer. 11 U.S.C. § 547; *In re Gateway Pacific Corp.*, 153 F.3d 915, 917 (8th Cir.1998).

The purpose of the avoidance power is to place all unsecured creditors on an equal basis for purposes of distribution of the debtor's assets, and "to prevent pre-petition dismantling of the debtor's estate." *In re Neponset River Paper Co.*, 231 B.R. 829, 833 (1st Cir. BAP 1999); *In re Armstrong*, 231 B.R. 723, 731 (Bankr.E.D.Ark. 1999) (citing *In re Bohlen Enterprises, Ltd.*, 859 F.2d 561, 566 n. 10 (8th Cir. 1988)).

There are six requirements necessary to establish a preferential transfer under § 547(b). Section 547(b) provides:

[T]he trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made ... on or within 90 days before the date of the filing of the petition ...

(5) that enables such creditor to receive more than such creditor would receive if—(A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547. The first requirement of a preferential transfer is found in the prerequisite that the transferred interest was "an interest of the debtor in property." 11 U.S.C. § 547(b). The other five requirements are found in the enumerated subprovisions of § 547(b). 11 U.S.C. § 547(b)(1)-(5).

The Court finds (and the parties do not dispute) that there is no genuine issue of material fact with regard to the require-

ments with the effective date of December 1, 2010.

ments found in § 547(b)(1)-(4). Specifically, the requirement of § 547(b)(1) is met because the evidence makes clear that the covenant-not-to-compete payments were sent to and received by Heartland; Heartland benefitted from receiving the transferred funds. The requirement of § 547(b)(2), that the payment be on account of an antecedent debt, is satisfied because the Debtors borrowed money from Heartland in 1997 and 2002, and the transferred funds at issue in this case were paid toward the balance on that outstanding debt on September 30, 2005. As for the requirement that the transfer be made within 90 days of filing, found in § 547(b)(4), the bankruptcy case was filed on October 14, 2005, just 14 days after the transfer. Finally, the element of insolvency, § 547(b)(3), is satisfied by the unchallenged presumption, as established in § 547(f), that the Debtors were insolvent during the 90–day period preceding the filing of the case.

The two remaining elements of a preferential transfer are at issue in this case: first, whether the transferred property was "an interest of the debtor in property[,]" and second, whether the transfer enables the creditor to receive more than it would receive under a liquidated Chapter 7 case, had the transfer not been made.

### Property Interest of the Debtors

 "The reach of § 547(b)'s avoidance power is ... limited to transfers of 'property of the debtor.'" *Begier v. I.R.S.,* 496 U.S. 53, 58, 110 S.Ct. 2258, 2262, 110 L.Ed.2d 46 (1990). Property of the debtor, for purposes of § 547, is "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Id. See also Brown v. First Nat. Bank of Little Rock, Ark.,* 748 F.2d 490, 492 n. 6 (8th Cir.1984) ("The paramount consideration is whether there has been a diminu-

tion in the bankrupt's estate as a result of the transfer."); *In re Borgman,* 48 B.R. 666, 667 (Bankr.W.D.Mo.1985). Property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a). The definition of property of the estate is interpreted broadly. *See U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 204, 103 S.Ct. 2309, 2313, 76 L.Ed.2d 515 (1983). The extent and validity of a debtor's interest in property is a question of state law. *See Barnhill v. Johnson,* 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992).

The Trustee proposes that the Debtors held an interest in the covenant-not-to-compete payments because they had contractual rights to receive those payments. The Trustee asserts that under Arkansas law, a right to payment under a contract is an interest in property. *See McDermott v. McDermott,* 336 Ark. 557, 565, 986 S.W.2d 843, 847 (1999) ("It is axiomatic that the right to perform a contract and to receive its profits, and the right to performance by the other party, are property rights entitling each party to the fulfillment of the contract by performance. In other words, enforceable contract rights are deemed to be property rights.") (citation omitted). The Trustee also points out that contractual rights are "widely recognized as property of the bankruptcy estate." *In re Phelps Technologies, Inc.,* 245 B.R. 858, 865 (Bankr.W.D.Mo.2000). The Trustee cites *In re Phelps* as support for the position that the covenant-not-to-compete payments were contractual rights, in which the Debtors had an interest. In the case of *In re Phelps,* the debtor agreed to sell its product for a purchase price of $2,200,000, to be paid over a period of 10 weeks. Within that agreement, the purchaser agreed to send $100,000 of the weekly payment to Phelps' creditor, Sharp.

Within 90 days of the debtor filing for bankruptcy, the purchaser had sent Sharp a total of $700,000 pursuant to the agreement. The bankruptcy court concluded that these payments were property interests of the debtor because the debtor had either a contractual right to or an account receivable in the transferred funds.

Heartland does not dispute the Trustee's contention that contractual rights are property of the estate. Instead, Heartland argues that the Debtors did not have a property interest in the covenant-not-to-compete payments because any rights the Debtors had in those payments were held for the benefit of Heartland. As discussed in more detail below, Heartland relies on *T & B Scottdale Contractors, Inc. v. U.S.*, 866 F.2d 1372, 1376 (11th Cir.1989) ("... funds in the debtor's possession held for a

third-party do not become part of the estate in bankruptcy ..."), and *In re LAN Tamers, Inc.*, 329 F.3d 204, 210 (1st Cir. 2003) ("The plain text of § 541(d) excludes property from the estate where the bankrupt entity is only a delivery vehicle and lacks any equitable interest in the property it delivers."). Heartland's argument is based on two assertions: first, that the covenant-not-to-compete payments were held in trust for the benefit of Heartland; and second, that the Debtors did not have sufficient control over the payments to hold a property interest in them.[12]

Heartland draws support for its argument that the covenant-not-to-compete payments were held in trust for the creditors from the legislative history of section 541,[13] which states:

*Brown v. First Nat. Bank of Little Rock, Ark.*, 748 F.2d 490, 492 n. 6 (8th Cir.1984) ("The mechanics of the transfer may not necessarily be determinative. The paramount consideration is whether there has been a diminution in the bankrupt's estate as a result of the transfer."). Therefore, even if Heartland has introduced sufficient facts to put the question of who made the payment at issue, that factual dispute will not create a genuine issue of material fact as to whether the Debtors had a property interest in the transferred funds.

Furthermore, even if this were the appropriate legal standard, Heartland has not put this fact in issue. There is evidence that CHS wired money for both the asset purchase and the covenant-not-to-compete payments to Land Services, the closing agent. Land Services distributed those funds according to Wiring Instructions prepared by Eugene Zuber, who was the Hospital Administrator for Newport Hospital and a personal advisor to the Debtors. The evidence does not support Heartland's position that the payment was made by CHS directly to Heartland.

**12.** Heartland makes a pronounced effort in its brief to argue that in order to prove that the Debtors had an interest in the $500,000, the Trustee must establish that the payment was made by the Debtors. This argument is not supported by the law, and does not require a separate inquiry into the facts. Heartland bases this argument on language from *In re Bruening*, 113 F.3d 838, 841 (8th Cir.1997), which states that "[t]he trustee, of course, has no right to recover a payment by a co-obligor of a debtor on a note, *or a payment by any third party for that matter*, that pays down a debt of the debtor." (Emphasis added). The legal rule Heartland wishes to extrapolate from this language is that *any* payment by a third party cannot be a preferential payment. Such an interpretation requires this Court to view the *Bruening* court's statement in a vacuum. The sentence immediately following the language quoted by Heartland explains, "[t]hat is because these payments, which would decrease the sum of the creditors' claims on the debtor, would have no effect on the estate of the debtor." *In re Bruening*, 113 F.3d at 841. Thus, the focus of the inquiry is, and was in *Bruening*, whether the transfer depleted the bankruptcy estate, and cannot be so limited as to turn entirely on whether the debtor was the transferor. *See DeAngio v. DeAngio*, 554 F.2d 863, 864 (8th Cir.1977);

**13.** The cited legislative history accompanies 11 U.S.C. § 541(d), which operates to limit the extent of the estate's interest in property in which the debtor holds "only legal title and not an equitable interest."

Situations occasionally arise where property ostensibly belonging to the debtor will actually not be property of the debtor, but will be held in trust for another. For example, if the debtor has incurred medical bills that were covered by insurance, and the insurance company had sent the payment of the bills to the debtor before the debtor had paid the bill for which the payment was reimbursement, the payment would actually be held in a constructive trust for the person to whom the bill was owed.

H.R.Rep. No. 95–595, at 368 (1977); S.Rep. No. 95–989, at 82 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 5787, 5868, 6324.[14]

Heartland cites and discusses two cases in support of this argument. The first case is *T & B Scottdale Contractors, Inc. v. U.S.*, 866 F.2d 1372 (11th Cir.1989). In that case, a general contractor opened a joint bank account with a debtor subcontractor, and according to a contractual agreement between them, placed funds in that account to pay for the equipment expenses incurred by the subcontractor. The contract specifically stated, "Contractor shall open a bank account in Subcontractor's name for the sole purpose of paying for equipment covered by Item 3 above. Contractor shall maintain control of such bank account, but account shall be set up [sic] joint signature by Contractor and Subcontractor." *T & B Scottdale*, 866 F.2d at 1373. The account was established and funds placed in the account. When the subcontractor subsequently filed bankruptcy, the bankruptcy trustee argued that the funds in the account were the debtor's property. The Court of Appeals for the Eleventh Circuit reversed the district court's ruling that the funds belonged to the bankruptcy estate simply because they were placed in an account bearing the debtor's name. The Court determined that the contractual agreement requiring that the funds be deposited in the debtor's account solely for the debtor's materialmen prevented the funds from becoming part of the bankruptcy estate.

In the second case, *In re Inca Materials, Inc.*, 880 F.2d 1307 (11th Cir.1989), the materialman creditor notified the debtor subcontractor's general contractor that it had not been paid by the debtor subcontractor, and that it was intending to proceed against that debtor subcontractor's payment bond. The general contractor then notified the debtor subcontractor that it would be withholding the amount claimed by the materialman from any payment to the debtor subcontractor on the bond. The debtor subcontractor then filed for bankruptcy, and the general contractor issued a check to both the debtor subcontractor and materialman "in order to settle [the materialman's] unsecured claim against [the debtor]." *In re Inca Materials, Inc.*, 880 F.2d at 1309. The debtor endorsed the check over to the materialman. The bankruptcy trustee argued that the transferred funds were a part of the debtor's bankruptcy estate. The Eleventh Circuit Court of Appeals affirmed the bankruptcy court's finding that the funds were not part of the bankruptcy estate, in part, based on the determination that the funds were held in a constructive trust to pay the debtor's materialmen.

Heartland also contends that whether the Debtors had a property interest in the covenant-not-to-compete payments should

---

**14.** A constructive trust is "a broad equitable remedy used when legal title to property has been obtained through fraud, misrepresentation, concealment, or other circumstances making it unjust for the holder to retain property." *In re Reeves*, 65 F.3d 670, 672 (8th Cir.1995); *see also N.S. Garrott & Sons v. Union Planters Nat'l Bank of Memphis (In re N.S. Garrott & Sons)*, 772 F.2d 462 (8th Cir. 1985).

turn on the amount of control the Debtors had over the payments at the time of the transfer. A number of cases dealing with the issue of payments to a debtor's creditors by a third party provide support for Heartland's contention that "control" is the determining factor of whether a property interest exists. *See Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1358 (5th Cir.1986) ("[T]he key to the resolution of this dispute centers on whether Coral had any control ..."); *In re Bankest Capital Corp.,* 374 B.R. 333, 338 (Bankr.S.D.Fla.2007) ("The dispositive question is whether the debtor had control over the subject funds."). *See also In re Scanlon,* 239 F.3d 1195, 1198 (11th Cir. 2001); *In re Montgomery,* 986 F.2d 1389, 1395 (6th Cir.1993); *In re Kemp Fisheries, Inc.,* 16 F.3d 313, 316 (9th Cir.1994). Furthermore, some courts determine control after navigating a two-part inquiry:

> [F]irst, the power to designate which party will receive the funds; and, second, the power to actually disburse the funds at issue to that party. In other words, control means control over identifying the payee, and control over whether the payee will actually be paid.

*In re Kemp Pacific Fisheries, Inc.,* 16 F.3d at 316. *See also In re Moses,* 256 B.R. 641, 650 (10th Cir. BAP 2000); *In re Safe–T–Brake of South Florida, Inc.,* 162 B.R. 359, 365 (Bankr.S.D.Fla.1993).[15]

■ The Court is not persuaded by Heartland's arguments, as explained below, and finds that the Trustee has presented sufficient evidence to find that the

covenant-not-to-compete payments were contractual rights owned by the Debtors, and that those contractual rights would have been a part of the bankruptcy estate had the transfer to Heartland not been made. Specifically, the Asset Purchase Agreement lists Debtors as individual parties to the agreement, and contains specific provisions providing that the covenant-not-to-compete payments were in exchange for the Debtors' agreement not to compete with the purchaser for a period of five years. Additionally, in his affidavit, Robert Smith explains that CHS demanded that the Asset Purchase Agreement contain the covenant-not-to-compete provisions, and that CHS agreed to provide the Debtors with the payments in exchange for that agreement. Finally, the affidavit of the Debtors' accountant explains that the Debtors will have to claim the covenant-not-to-compete payments as income on their income tax returns. Thus, there is ample evidence that the Debtors had entered into a valid, enforceable contractual agreement for which they promised not to compete with CHS for five years in exchange for the covenant-not-to-compete payments.

Although Heartland argues that the parallels between the facts present in this case, and those present in the cases of *T & B Scottdale* and *In re Inca Materials,* necessitate a finding that the covenant-not-to-compete payments were not property of the estate because those funds were held in trust for Heartland's benefit, the Court finds those cases are distinguishable. In

---

15. Although there is an overlap of factually similar circumstances and controlling authority in this case and certain cases involving the "earmarking doctrine," that doctrine is inapplicable to this case because a key component of the earmarking doctrine, at least in the Eighth Circuit, is the creation of a new debt (with the third party who makes the payment) that takes the place of the old debt (of the creditor who received the payment). *See In re Bohlen Enterprises, Ltd.,* 859 F.2d 561, 565 (8th Cir.1988); *In re Interior Wood Products Co.,* 986 F.2d 228, 232 (8th Cir.1993); *In re Libby Intern., Inc.,* 240 B.R. 375, 377 (Bankr. W.D.Mo.1999). Further, neither party argued that the "earmarking doctrine" is applicable in this case.

both of those cited cases, a payment to the debtor's creditor was made directly out of funds received by the debtor from a third party. That fact is also present in this case; the funds used to pay Heartland came from a third party, CHS. However, the parallels between these factual scenarios stops short of the legal conclusions urged by Heartland.

In both *T & B Scottdale* and *In re Inca Materials,* the determinative fact on this issue was that the funds were provided to each debtor for the specific purpose of paying that debtor's creditor. In other words, the party delivering the funds to the debtor did so on the condition that those funds be paid to the debtor's creditor. No such condition exists in this case. The evidence presented by Heartland establishes that the Creditors expected to be paid out of the proceeds of the Asset Purchase Agreement. The Consent to Sale Agreement specified that "[a]t Closing [of the Asset Purchase Agreement], a distribution of no less than $1,400,000 shall be made by the Hospital ..." to the Creditors. Furthermore, the Smith Emails establish that the Creditors demanded that the Debtors use the covenant-not-to-compete payments to fulfill the Consent to Sale Agreement obligations. Additionally, the affidavits of the Creditors' representatives state that they would not have agreed to the Consent to Sale Agreement if the covenant-not-to-compete payments were not used to satisfy those obligations (although they did not specify which creditor would receive those specific payments). Significantly, the only agreement obligating the Debtors to pay Heartland was the Consent to Sale Agreement, and CHS (the entity making the payment) was not a party to that agreement. Similarly, the Asset Purchase Agreement did not contain any provision entitling Heartland to payment, and Heartland was not a party to the Asset Purchase Agreement. The facts do not establish that CHS in any way conditioned its payment of the funds on the requirement that those funds be forwarded to Heartland or any other creditor. Rather, the Debtors directed that their interest in the covenant-not-to-compete payments be transferred to Heartland to satisfy their obligations under the Consent to Sale Agreement. The facts on which the determinations in *T & B Scottdale* and *In re Inca Materials* turned are not present in this case. When CHS agreed to pay Debtors $500,000 in consideration for their covenants not to compete, it did not condition that payment on Debtors' agreement to pay those funds to Heartland.

Heartland also failed to persuade the Court that a genuine issue of material fact exists as to the Debtors' control over the covenant-not-to-compete payments. As stated above, the Asset Purchase Agreement lists the Debtors as individual parties to the agreement, and contains specific provisions providing that the covenant-not-to-compete payments were in exchange for the Debtors' agreement not to compete with the purchaser. Further, the Asset Purchase Agreement separates the payments made for the covenants-not-to-compete from the payment made for the sale of the business assets. Additionally, in his affidavit, Robert Smith explained that CHS demanded that the Asset Purchase Agreement contain the covenant-not-to-compete provisions, and that CHS agreed to provide the Debtors with the payments in exchange for that agreement. These facts prove that the covenant-not-to-compete payments resulted from a valid, enforceable contractual agreement in which the Debtors were entitled to receive—and to control—the payments received under that agreement.

Documentation of the transaction also shows that the covenant-not-to-compete payments were within the Debtors' con-

trol. For example, the Closing Statement establishes a separate category of consideration for each of the three covenant-not-to-compete payments, naming each of the Debtors individually in relation to their payment. Finally, the affidavit of Robert Smith states that once the covenant-not-to-compete payments were made by CHS to Land Services, those funds were subject to the control of the Debtors. The affidavit of Eugene Zuber states that in creating the Wiring Instructions directing that the covenant-not-to-compete payments be paid to Heartland, he was acting as the Debtors' personal advisor, and that he received the Debtors' consent and authorization before transferring the covenant-not-to-compete payments to Heartland. Heartland attempts to dispute the Debtors' control over the funds by pointing out that the Wiring Instructions listed Eugene Zuber's title as Hospital Administrator, and not as personal advisor for the Debtors. Mr. Zuber has submitted an affidavit attesting to the capacity in which he signed the Wiring Instructions—merely pointing out the title listed on the Wiring Instructions is not sufficient evidence to controvert Mr. Zuber's affidavit testimony that he was acting on behalf of the Debtors as their personal advisor. Heartland had the opportunity to—but did not—produce evidence disputing Mr. Zuber's affidavit testimony as required under Fed.R.Civ.P. 56(c). Accordingly, nothing would be gained by holding a trial; the evidence fully supports a finding on summary judgment that the Debtors controlled the covenant-not-to-compete payments.

Based on the evidence submitted, the Court finds that the Debtors had a valid contractual right to receive the covenant-not-to-compete payments under the Asset Purchase Agreement. The Debtors were not required by the payor to transfer those funds to Heartland, and as a result, Heartland fails in its assertion that the Debtors' interest in the funds were held in trust for Heartland's benefit. Furthermore, the evidence presented shows that the Debtors had control of the covenant-not-to-compete payments and directed that the payments be transferred to Heartland. Accordingly, there is no genuine issue of material fact as to whether the Debtors had a property interest in the covenant-not-to-compete payments, and the Court finds that the property interest element of § 547(b) is met.

### The Hypothetical Chapter 7 Test

Heartland asserts that the $500,000 covenant-not-to-compete payments did not constitute a preferential transfer because they do not meet the requirements of 11 U.S.C. § 547(b)(5)(A)-(C) which are collectively referred to as the "hypothetical Chapter 7 test." This test provides that a preference exists only if the transferred property enables the creditor to receive more than it otherwise would under a Chapter 7 liquidation of the debtor's estate. The Trustee maintains that the Court already decided in its Order on First Motion for Summary Judgment that Heartland will receive more than it would have received under a Chapter 7 liquidation if it is allowed to keep the $500,000 covenant-not-to-compete payments. The Trustee argues that the Court's prior ruling is law of the case, and as such, precludes Heartland's argument that § 547(b)(5) is not met. In the Order on First Motion for Summary Judgment, the Court made a finding of fact that "[i]f Heartland retains the Non–Compete Payment, it will receive more than it would have received under Chapter 7 had the $500,000 not been paid to Heartland." (Order on First Motion for Summary

Judgment, p.6).[16] The Trustee is correct that the Court's prior ruling is law of the case,[17] but because Heartland now claims that a payment it is likely to receive on account of its security interest in the Debtors' Newport Hospital stock establishes a value for its secured claim, and that it will not in fact receive more on account of the $500,000 covenant-not-to-compete payments, the Court will explain why there continues to be no genuine issue of material fact with respect to the hypothetical Chapter 7 test.

 The hypothetical Chapter 7 test compares two calculations: (1) the amount a creditor would receive on its claim in a hypothetical Chapter 7 liquidation had no transfer been made (the "hypothetical liquidation"), and (2) the amount the creditor received from the allegedly preferential transfer combined with the amount the creditor would be entitled to receive on its claim in the actual bankruptcy case (the "real liquidation"). 11 U.S.C. § 547(b)(5). *See In re Auto–Train Corp.*, 49 B.R. 605, 609–10 (Bankr. D.D.C.1985) (comparing "a real liquidation in which the Court looks at the value of the secured claim on the date of bankruptcy, plus the transfer," to "a hypothetical liquidation, in which the Court determines the value of the secured claim if the transfers had not occurred."). *See generally In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1421 (9th Cir.1985) (citing *Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 451, 80 L.Ed. 655 (1936));

**16.** The Court went on to note:

> Additionally, Heartland references its security interest in the Debtors' stock. It does not offer an estimated value of the stock, which is in a company that recently sold substantially all of its assets. The security interest in the stock, without more, does not demonstrate that Heartland is a secured creditor for the purposes of this bankruptcy case. 11 U.S.C. § 506(a). As discussed *infra*, note 3, the secured status of a claim is only relevant to preference analysis to the extent that it determines the amount the creditor would have received in a Chapter 7 liquidation. Consequently, without any estimate of the value of the collateral, mere status as a secured creditor will not avail a creditor attempting to retain an alleged preference payment.

(Order on First Motion for Summary Judgment, p.6, n.2). The Court further elaborated:

> Additionally, assuming that Heartland is a secured creditor, its collateral is stock of, at best, undetermined value. As explained in the cases cited by Heartland:
>
> > Section 547(b)(5) does not give automatic protection to all secured creditors who receive preference-period pre-petition payments on their secured loans; indeed, "secured creditors" are not mentioned as such in this provision. Rather, it protects only those creditors, secured or unse-cured, who can establish that they received no more by the payment than they would have received as claimants in a Chapter 7 liquidation ... Secured creditors paid out of collateral proceeds will usually meet the § 547(b) conditions because of the primacy of secured claims against the estate, but not necessarily.

*Hager v. Gibson*, 109 F.3d 201, 210 (4th Cir.1997); *see also Falcon Creditor Trust v. First Ins. Funding (In re: Falcon Prods., Inc.)*, 381 B.R. 543 (8th Cir. BAP 2008) (distinguishing between fully and partially secured creditors as recipients of pre-petition transfers). Heartland also alleges that the source of the Non–Compete Payment was the liquidation of its collateral, but the record does not indicate that the collateral stock has been sold or otherwise liquidated. Because this allegation is made wholly without evidence, the Court need not consider it.

(Order on First Motion for Summary Judgment, p.7, n.3).

**17.** Issues which have been previously litigated are barred by the "law of the case" doctrine which prevents the "relitigation of settled issues in a case, thus protecting the settled expectations of parties, ensuring uniformity of decisions, and promoting judicial efficiency." *Little Earth of United Tribes, Inc. v. U.S. Dep't of Hous. and Urban Dev.*, 807 F.2d 1433, 1440–41 (8th Cir.1986).

*Barash v. Public Finance Corp.*, 658 F.2d 504, 508–09 (7th Cir.1981). If the real liquidation amount exceeds the hypothetical liquidation amount, the § 547(b)(5) requirement is met, and the transfer may be preferential.

 This analysis is often simplified by examining whether the creditor was paid on an unsecured, a secured claim, or a partially unsecured claim. *See In re Auto–Train Corp.*, 49 B.R. at 610 (citing *Barash*, 658 F.2d at 507; *In re Zuni*, 6 B.R. 449, 452 (Bankr.D.N.M.1980)). As explained by the *Auto–Train* court,

A creditor who receives payment on an unsecured claim has always been preferred because he does not release any collateral to the debtor. He has obtained an unfair advantage at the expense of other creditors because he has "receive[d] a greater proportion of [his] unsecured claims than other unsecured claimants" who received payment after liquidation....

On the other hand, a creditor who receives payment on a secured claim has not been preferred because he has merely realized the value of his collateral earlier than he would have if he had waited until liquidation. These payments do not deplete the debtor's estate, and thereby deprive other creditors of their fair share of payment.

*In re Auto–Train Corp.*, 49 B.R. at 610 (internal citations omitted). Stated another way, where the creditor has an unsecured claim, "as long as the distribution in bankruptcy is less than one-hundred percent, any payment 'on account' to an unsecured creditor during the preference period will enable that creditor to receive more than he would have received in liquidation

had the payment not been made." *In re Allegheny Health*, 292 B.R. 68, 78 (Bankr. W.D.Pa.2003). The United States Supreme Court demonstrated this principle with the following example:

[W]here the creditor's claim is $10,000, the payment on account $1000, and the distribution in bankruptcy 50%, the creditor to whom the payment on account is made receives $5500, while another creditor to whom the same amount was owing and no payment on account was made will receive only $5000.

*Palmer Clay Products*, 297 U.S. at 229, 56 S.Ct. 450. Likewise, with respect to a partially secured debt,[18] "a payment to the creditor does not result in the release of an equivalent amount of collateral, and enables the creditor to receive more than he or she would have received in a Chapter 7 liquidation, and so may result in preference." CJS BANKRUPTCY § 680 (citing *Matter of Prescott*, 51 B.R. 751, 41 U.C.C. Rep. Serv. 1873 (Bankr.W.D.Wis.1985), subsequently aff'd, 805 F.2d 719 (7th Cir. 1986) and (rejected on other grounds by, *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030 (5th Cir.1987)); *In re Fitzgerald*, 49 B.R. 62 (Bankr.D.Mass. 1985)). A creditor's secured claim is valued as of the date of the bankruptcy filing. *In re Auto–Train Corp.*, 49 B.R. at 609–10; *In re Falcon Products, Inc.*, 381 B.R. 543, 546 (8th Cir. BAP 2008).

The Trustee argues there is no dispute that Heartland's claims are at least partially unsecured (as Heartland's claim totals over $2 million, and it values its security interest at approximately $1.2 million), and that the unsecured creditors in the Debtors' Chapter 7 case will not receive payment on 100 percent of their claims (because there are over $4.7 million in filed

**18.** Pursuant to 11 U.S.C. § 506(a), a creditor's claim is secured to the extent of the value of its collateral, and unsecured to the extent that the debt owed to the creditor exceeds that value.

unsecured claims). The Trustee also points out that Heartland provides no evidence of the value of its security interest as of the petition date, and does not allege that it released any of its security interest upon receipt of the $500,000 covenant-not-to-compete payments. (*Trustee's Statement of Undisputed Facts in Support of Second Motion for Summary Judgment*, ¶¶ 14–15, referencing Heartland's Responses to First Requests for Admissions, Exhibit 9, Request for Admission No. 22 and the Zuber Affidavit). As a result, the Trustee argues that the retention of the $500,000 in covenant-not-to-compete payments necessarily enables Heartland to obtain more than it would under a hypothetical Chapter 7 liquidation had the transfer not been made.

In contrast, Heartland argues for a different application of the comparison to be made under § 547(b)(5). Heartland argues that the proper comparison under the hypothetical Chapter 7 test is a strict comparison of the amount the creditor received through the transfer, and the amount the creditor would receive under a hypothetical Chapter 7 liquidation of the Debtors' estate. The comparison figures in Heartland's argument are derived from events occurring post-petition rather than the date of the Debtors' bankruptcy filing. Specifically, the Trustee in the Newport Hospital bankruptcy case has filed a Motion to Disburse Funds, in the amount of $900,000, to the Debtors' bankruptcy estate. The Debtors are to receive this disbursement on the basis that they are the sole stockholders in Newport Hospital. Heartland claims a security interest in over 99% of the $900,000 distribution to the estate as proceeds of its collateral—the Debtors' stock in Newport Hospital. As a result, Heartland argues that it would receive at least $900,000 (and possibly up to $1,271,960.57 as explained *infra*, note 20) in a hypothetical Chapter 7 bankruptcy case, and because $900,000 is more than the $500,000 covenant-not-to-compete payments, it did not receive more from the transfer than it would under a hypothetical Chapter 7 liquidation.

Heartland's argument misstates the hypothetical Chapter 7 test and too narrowly limits the scope of the figures to be compared under the test. The court in *Barash* explained the limitations of such a comparison with the following example:

> [I]f upon liquidation unsecured creditors would be paid 20% of their claims (based on remaining assets and scheduled claims after secured creditors are paid), to defeat a trustee's avoidance rights a creditor would have to show only that the payments received during the 90-day period do not exceed 20% of the creditor's unsecured claim. This sole comparison, however, does not account for what happens thereafter. If the payments made were less than 20%, there would be no preference and the creditor ***would keep the payments and later also receive a pro-rata share of the balance of his claim.*** In the final analysis, this would violate the fundamental principle of equal distribution among a class of claims.

*Barash*, 658 F.2d at 508–09 (emphasis added). The appropriate comparison is not between the amount transferred and the amount the creditor would receive under a hypothetical Chapter 7 liquidation of the Debtors' estate. Instead, the appropriate analysis includes, on one side of the scale, the amount the transfer enables the creditor to receive including the total of both the transferred amount and the amount the creditor can expect to receive on its claims within the present bankruptcy case (the "real liquidation" amount). The total for this amount is then weighed against, on the other side of the scale, the amount the creditor would receive under a hypotheti-

cal Chapter 7 liquidation had the transfer never taken place (the "hypothetical liquidation" amount).

The Court concludes that when the hypothetical Chapter 7 test is correctly applied to the undisputed facts of this case, there are no genuine issues of material fact regarding whether the requirements of § 547(b)(5) are met. There is no question that Heartland's claims are at least partially unsecured. Heartland has filed two claims in the Debtors' bankruptcy case. The total of Heartland's combined claims is $2,033,057.29.[19] Both of Heartland's claims are secured by the Debtors' stock in Newport Hospital. Heartland asserts that the value of the Newport Hospital stock may be as high as $1,271,960.57 based on the total amount of funds held in the estate of the Newport Hospital bankruptcy case.[20] This valuation would leave Heartland with a total of $761,096.72 in unsecured claims in this case.

No one disputes that the unsecured creditors in this case will receive less than 100 percent payment on their claims. The Trustee's affidavit states that the unsecured claims in the Debtors' bankruptcy case, which will receive a *pro rata* distribution of the assets, total more than $4,700,000.[21] The Trustee's affidavit also states that the assets held in the Debtors' estate are believed to have a value of less than $500,000.[22] Furthermore, the Trustee stated in his affidavit that "[a]lthough the Trustee anticipates receiving additional cash from the Debtors' stock in Newport Hospital, under no circumstances do I foresee receiving sufficient cash to pay unsecured creditors 100% of their claims." Heartland does not refute these facts, and as a result, it is undisputed that Heartland is partially unsecured and that the unsecured creditors in this case will not receive 100 percent payment on their claims.

Furthermore, it is undisputed that Heartland did not release any of its security interest in the Debtors' Newport Hospital stock when it received the $500,000 covenant-not-to-compete payments. Heartland does not dispute this assertion, and in fact, maintains that it holds an interest in over 99.94% interest of the Debtors' Class A stock, and 99.995% of the Debtors' Class B stock in Newport Hospital. (*Heartland's Statement of Undisputed Facts*, p.9; *Heartland's Brief in Response to Plaintiff's Motion for Summary Judgment*, p.14).

Because it is undisputed that Heartland's claims are partially unsecured, that the unsecured creditors in this case will

**19.** Heartland's Claim No. 12 is for $1,467,433.31, and Claim No. 13 is for $565,623.98.

**20.** The Trustee in the Newport Hospital bankruptcy case is seeking to distribute $900,000 to the Debtors' bankruptcy estate as partial payment of the estate's claim based on the Debtors' ownership of the Newport Hospital stock. At the time of that request, there was an additional $371,960.57 in the Newport Hospital estate. Heartland argues that those funds will eventually be disbursed to the Debtors' estate because all other claims in the Newport Hospital case have been paid. Thus, Heartland argues that the value of its security interest in the Debtors' stock in Newport Hospital is equal to the entire $1,271,960.57

amount that will potentially be distributed to the Debtors on their claim as the Newport Hospital stockholders.

**21.** The Trustee does not specify whether this figure includes the more than $2,000,000 in claims filed by Heartland, which were originally filed as unsecured claims. However, reducing this figure by the amount of Heartland's secured claims does not affect the outcome of the Court's determination on this issue.

**22.** The Court notes that as of June 30, 2010, the Trustee in the Debtors' bankruptcy case was holding funds in the amount of $537,430.52.

not be paid in full, and that Heartland released no portion of its collateral upon payment of the $500,000 covenant-not-to-compete payments, those payments necessarily enabled Heartland to receive more than it would under a hypothetical Chapter 7 liquidation if the transfer had not been made. Under the hypothetical liquidation calculation, had the transfer not occurred, Heartland would receive a payment on account of its security interest in the Debtors' Newport Hospital stock (up to $1,271,960.57) and a *pro rata* distribution on its unsecured claim (which would be $500,000 higher than it otherwise would have been, but still would not be paid in full). Under the real liquidation calculation, Heartland will retain the $500,000 covenant-not-to-compete payments, receive a payment on account of its security interest in the Debtors' Newport Hospital stock (up to $1,271,960.57) and receive a *pro rata* distribution of the estate as an unsecured creditor. The real liquidation calculation is greater than the hypothetical liquidation calculation, in short, because when the $500,000 comes back into the Debtors' estate, it will not be completely paid out to Heartland but will be subject to a *pro rata* distribution to unsecured creditors instead.

As explained herein, the Trustee has shown there are undisputed facts proving that Heartland's retention of the covenant-not-to-compete payments enables it to receive more than it would under the hypothetical Chapter 7 test had the transfer not been made. The Court finds that the requirements of § 547(b)(5) have been met, and summary judgment is appropriate as to the hypothetical Chapter 7 test.

## CONCLUSION

The Court finds, and the parties do not dispute, that the elements of a preferential transfer have been met other than the requirement that the transferred property be an interest of the Debtor in property and the requirement that the transfer enable the creditor to receive more than the creditor would receive under the hypothetical Chapter 7 test. The Court concludes that there is no genuine issue of fact as to whether the Debtors had a property interest in the covenant-not-to-compete payments, and has further explained why the receipt of the covenant-not-to-compete payments enables Heartland to obtain more than it would under the hypothetical Chapter 7 test. Accordingly, the $500,000 covenant-not-to-compete payments received by Heartland constitute a preferential transfer under 11 U.S.C. § 547, and are therefore recoverable by the Trustee. For the reasons stated above, it is hereby

**ORDERED** that the Plaintiff's *Motion for Summary Judgement* is **GRANTED.** The covenant-not-to-compete payments to Heartland are recoverable by the Trustee as preferential transfers. The Trustee shall prepare a proposed judgment for the Court's review and submit it to the Court within fourteen days of the entry of this Order.

**IT IS SO ORDERED.**